128 F.3d 481
 13 IER Cases 545
 Rose GOSSMEYER, Plaintiff-Appellant,
v.
Jess McDONALD, individually and as Director of Illinois
Department of Children and Family Services, Cleo Terry,
individually and as Executive Deputy Director of Illinois
Department of Children and Family Services, Denise Kane,
individually and as Inspector General of Illinois Department
of Children and Family Services, et al., Defendants-Appellees.
 No. 96-2599.
 United States Court of Appeals,
Seventh Circuit.
 Argued Feb. 10, 1997.
Decided Oct. 7, 1997.
 
 Aldo E. Botti, Peter M. DeLongis, Andrew Y. Acker (argued), Botti, Marinaccio & Tameling, Oak Brook, IL, for Plaintiff-Appellee.
 Jan E. Hughes, Mary E. Welsh (argued), Office of the Attorney General, Civil Appeals Division, Chicago, IL, for Defendants-Appellees Jess McDonald, Cleo Terry and Denise Kane.
 Mary D. Mallo (argued), Office of the State's Attorney of Cook County, Margaret A. Glass, Office of the State's Attorney of Cook County, Chicago, IL, for Defendants-Appellees Robert Farley, Cook County Sheriff's Police Department and Michael F. Sheahan.
 Joseph M. Ferguson (argued), Office of the United States Attorney, Civil Division, Appellate Section, Thomas P. Walsh, Office of the United States Attorney, Civil Division, Chicago, IL, for Defendant-Appellee Robert Williams.
 Before BAUER, EASTERBROOK, and DIANE P. WOOD, Circuit Judges.
 BAUER, Circuit Judge.
 
 
 1
 Rose Gossmeyer, a Child Protective Investigator for the Illinois Department of Children and Family Services ("DCFS"), originally filed this action under 42 U.S.C. § 1983 in Will County Circuit Court. Her suit was later removed to the Northern District of Illinois. There, Gossmeyer filed a first amended complaint. In Count I, Gossmeyer alleged that her Fourth, Fifth, and Fourteenth Amendment rights were violated when personnel from the DCFS Office of the Inspector General ("OIG"), accompanied by several law-enforcement officials, searched her office, filing cabinet, two-door storage unit, and desk, pursuant to an anonymous tip that Gossmeyer kept child pornography in her file cabinet. In Count II, Gossmeyer alleged a conspiracy to violate her Fourth, Fifth, and Fourteenth Amendment rights. In Counts III and IV, Gossmeyer alleged that several officials violated and conspired to violate her rights under the Illinois Constitution, Article 1, Section 6. Finally, in Count V, Gossmeyer brought a state-law defamation claim against the not-so-anonymous tipster, her co-worker, Mary Dilworth. The district court, finding that the search was reasonable, dismissed Counts I and II as to all defendants with prejudice, dismissed Counts III and IV as to defendant the United States with prejudice, and, as to all other defendants, remanded Counts III, IV and V to the Will County Circuit Court. On appeal, Gossmeyer contends that the search was not a workplace search and that it was therefore subject to the probable cause and warrant standard of the Fourth Amendment. Alternatively, she argues that even if the search was a workplace search, it was unreasonable. We affirm.
 
 Background
 
 2
 The district court accepted Gossmeyer's factual allegations as true for purposes of the defendants' motions to dismiss, and we do the same. Apostol v. Landau, 957 F.2d 339, 343 (7th Cir.1992). Rose Gossmeyer worked (and still works) as a Child Protective Investigator for DCFS assigned to a DCFS field office in Joliet, Illinois. Gossmeyer's position required her to investigate instances of child neglect, abuse, and sexual abuse. Her position involved photographing evidence for use in court proceedings. Because the Joliet office had limited storage facilities, Gossmeyer bought, at her own expense, a four-drawer file cabinet and a two-door storage unit, each of which was equipped with a lock. She used the file cabinet to store evidentiary photographs, photographic equipment, files, and documents. She used the storage unit to store sundry items related to her work with children, coffee, and some personal items. Gossmeyer locked the cabinets when they were not in use or when she was not in her office. Gossmeyer had her own private key to the cabinets.
 
 
 3
 On August 8, 1994, Mary Dilworth, a DCFS Child Protective Lead Investigator in the Joliet office, anonymously informed Robert Farley, a detective in the Cook County Sheriff's Department, that she worked in the Joliet DCFS office and that Gossmeyer had pornographic pictures of children in her file cabinet at work. Farley called the DCFS OIG and relayed the message.
 
 
 4
 On August 9, 1994, at approximately 4:55 p.m., John Heath, an investigator from the OIG, called Carla Hay, a Child Protection Supervisor in the Joliet office. Heath told Hay to vacate all staff from the Joliet office. Heath informed Hay that she and Donna Walsh, another Child Protection Supervisor, were to remain in the office. At approximately 5:05, Walsh, who was in the middle of evacuating the Joliet office's staff, was notified that Heath was at the front door with six other people, who were later identified as the following Defendants-Appellees: Farley, Cook County Sheriff's officer Thomas Bohling, Illinois State Police officer Paula Barrows, Illinois State Police officer Art Sebak, U.S. postal inspector Robert Williams, and an unidentified DCFS employee known as "Jesse."[1] When the group entered, Gossmeyer was still present but was being escorted out of the office along with the other personnel, save Hay and Walsh.
 
 
 5
 Upon entering the office, no one in the group explained the reason for their visit except Heath and Jesse stated that they were acting on an anonymous tip. No one in the group produced a warrant. Heath displayed his badge to Hay, and Hay escorted Heath and Jesse to Gossmeyer's office. Heath and Jesse entered Gossmeyer's office and told Hay to unlock Gossmeyer's desk, filing cabinet, and storage unit. Hay had her own key to Gossmeyer's storage unit, and she unlocked the unit for the men. Hay indicated that she did not have a key to unlock Gossmeyer's file cabinet or desk. Heath and Jesse pried open the desk and file cabinet with their tools. Heath and Jesse ordered Farley and two of the unidentified police officers to detain Hay in her office and Barrows and one of the unidentified officers to detain Walsh in her office. Heath and Jesse also ordered that neither woman was to make any phone calls. Upon completing their search, Heath and Jesse put some items in a bag.
 
 
 6
 At approximately 7:00 p.m., Heath called Farley into Gossmeyer's office to look at some photographs taken from Gossmeyer's filing cabinet. Farley told Heath that the photographs were evidence, not pornography. Heath called an unknown person on his cell phone. Farley got on the phone and told the unknown person that "there was nothing here, I am out of here." Farley then went into Hay's office and told her that the visit was "ridiculous" and "a waste of [his] time." Farley, Barrows, Williams, Bohling, and Sebak all left the DCFS office soon afterwards.
 
 
 7
 At about 8:00 p.m., Heath told Hay that he and Jesse would remain to "guard the office." Hay told Heath to get a warrant, but Heath told her that he did not need one. Walsh asked Heath what they were supposed to tell their co-workers, to which Heath replied that they should tell their co-workers that there is an open investigation. Hay and Walsh were allowed to leave the office at approximately 8:15 p.m. After leaving the office, Hay stopped at Gossmeyer's home and informed Gossmeyer of the recent events. The news upset Gossmeyer.
 
 
 8
 On August 10, 1994, Gossmeyer and her then-lawyer, Joseph Polito, went to the DCFS Joliet office where Heath met with them. Heath asked Gossmeyer if she would consent to a search of her desk. She refused. Gossmeyer then did an inventory of her desk and noted that some personal items were missing. Gossmeyer sought medical treatment from her physician and psychiatrist for physical and emotional distress as well as depression. On August 10, 1994, Gossmeyer took a leave of absence from work.
 
 
 9
 Upon returning to work, Gossmeyer resumed her regular duties until September 20, 1994, when Defendant-Appellee Jess McDonald, Director of DCFS, placed her on desk duty and prohibited her from having any client contact. Some time in September, Gossmeyer discovered that the personal items which had been removed from her desk during the search on August 9 had been returned to her locked desk without her knowledge or consent. It was also some time in September when an officer from the OIG showed Will County State's Attorney James Glasglow some, and possibly all, of the photographs taken from Gossmeyer's files.
 
 
 10
 On December 9, 1994, Gossmeyer was told that she could return to her regular duties except that she was relieved of her responsibility for taking photographs for DCFS. Gossmeyer has never been informed by DCFS or the OIG that their investigation has ended nor has she been advised as to any findings made by DCFS or the OIG stemming from the August 9 search. Gossmeyer has never been charged or indicted for any crime in connection with that search.
 
 
 11
 Gossmeyer originally filed this § 1983 action on August 7, 1995, in the Will County Circuit Court, Joliet, Illinois. Gossmeyer named McDonald, Terry, Kane, Smith, Heath, Barrows, and Dilworth in their individual capacities. She named Farley in his official and individual capacities. Gossmeyer also named the Cook County Sheriff's Police Department. Finally, she named Four Unknown Officers, without specifying in what capacity she named them. On September 15, 1995, pursuant to 28 U.S.C. § 1441, Farley filed a Notice of Removal to have the case removed to United States District Court for the Northern District of Illinois.
 
 
 12
 On December 22, 1995, Gossmeyer filed a five-count first amended complaint, in which she named all of the defendants from her first complaint in their individual and official capacities, substituted the Cook County Sheriff's Police Department with Cook County Sheriff Michael F. Sheahan in his official capacity only, added Robert Williams in his individual capacity only, and replaced the Four Unknown Officers with Thomas Bohling of the Cook County Sheriff's Police Department and Art Sebak of the Illinois State Police, in both their individual and official capacities. In Counts I and II, pursuant to 42 U.S.C. § 1983, Gossmeyer alleged violations of her right to privacy under the Fourteenth Amendment and her right to be free from unreasonable searches and seizures under the Fourth Amendment and the Illinois Constitution, Art. I, § 6. She also alleged violations of her right to due process under the Fifth and Fourteenth Amendments. In Count II, Gossmeyer alleged a conspiracy under § 1983. In Counts III and IV, Gossmeyer alleged that several officials violated and conspired to violate her rights under Article I, Section 6 of the Illinois Constitution. Finally, in Count V, Gossmeyer brought a state-law defamation claim against Dilworth.
 
 
 13
 On February 8, 1996, Sheahan, Farley, and Bohling filed a joint motion to dismiss, pursuant to Federal Rule of Civil Procedure 12(b)(6). On April 19, 1996, a Certification pursuant to 28 U.S.C. § 2679(d)(1) was filed on behalf of Williams, along with Williams' motion to substitute the United States as a party defendant. The United States and Williams also jointly filed a motion to dismiss Counts I through IV (the counts pertaining to them), pursuant to Rule 12(b)(1) and 12(b)(6). On May 2, 1996, McDonald, Terry, Kane, Smith, Heath, Barrows, Sebak, and Dilworth filed a joint motion to dismiss, pursuant to Rule 12(b)(6).
 
 
 14
 On May 28, 1996, the district court granted Williams' motion to substitute the United States as a party, granted the United States' motion to dismiss Counts III and IV with prejudice, and granted Williams' motion to dismiss Counts I and II with prejudice, which the court treated as Bivens claims. The court also granted Farley, Bohling, and Sheahan's motion to dismiss Counts I and II with prejudice and granted McDonald, Terry, Kane, Smith, Heath, Barrows, Sebak, and Dilworth's motion to dismiss Counts I and II with prejudice. The court granted the motions to dismiss as to Counts I and II because it found that the search of Gossmeyer's office was reasonable and, therefore, legal. The court remanded Counts III, IV, and V, the remaining supplemental state-law claims. The district court later ordered that the remand be stayed pending disposition on appeal.
 
 
 15
 Gossmeyer appeals, arguing that the district court erred in dismissing Counts I and II because the search of her office was unreasonable. Gossmeyer argues that the reasonableness test from O'Connor v. Ortega, 480 U.S. 709, 107 S.Ct. 1492, 94 L.Ed.2d 714 (1987), which governs workplace searches, was inapplicable because the search was not a workplace search but, rather, pursuant to a criminal investigation. She also argues that, even if Ortega applies, the district court erred in applying Ortega because the search was unreasonable at its inception and in its scope.
 
 Analysis
 A. Initial Removal Concerns
 
 16
 At oral argument, the panel asked the parties to submit supplemental authority regarding whether our decision in Frances J. v. Wright, 19 F.3d 337 (7th Cir.), cert. denied, 513 U.S. 876, 115 S.Ct. 204, 130 L.Ed.2d 134 (1994), barred Gossmeyer's suit from federal court because, in Gossmeyer's first amended complaint (the only complaint which we had before us at the time), some of the defendants were state employees named in their official capacities.
 
 
 17
 The Eleventh Amendment provides, "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. C ONST. amend. XI. Although the express terms of the Eleventh Amendment do not say as much, the Supreme Court long ago held that a citizen of a state may not bring an action against his own state in federal court. Hans v. Louisiana, 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890). Both the Court and this Circuit have held that the Eleventh Amendment bars an action in federal court against a state, its agencies, or its officials in their official capacity. See Pennhurst State School & Hosp. v. Halderman, 465 U.S. 89, 100-02, 104 S.Ct. 900, 907-10, 79 L.Ed.2d 67 (1984) (determining that all federal suits against a state or its agencies are barred by the Eleventh Amendment unless the state consents to suit in federal court or Congress, pursuant to the Fourteenth Amendment, abrogates the state's Eleventh Amendment immunity); Scott v. O'Grady, 975 F.2d 366, 369 (7th Cir.1992), cert. denied, 508 U.S. 942, 113 S.Ct. 2421, 124 L.Ed.2d 643 (1993) (finding that "an official-capacity suit against a state official is deemed to be a suit against the state and is thus barred by the Eleventh Amendment, absent a waiver by the state or a congressional override"). However, a suit against a state official in his individual capacity is not barred by the Eleventh Amendment. Scott, 975 F.2d at 369.
 
 
 18
 In Frances J., we discussed federal law concerning state sovereign immunity in the context of the removal jurisdiction of the federal courts. An action cannot be removed to federal court if it could not have originally been filed in federal court. See 28 U.S.C. § 1441(a); Frances J., 19 F.3d at 341. "A state's sovereign immunity, whether rooted in the Hans doctrine or the Eleventh Amendment, limits the original subject matter jurisdiction of the federal courts." Frances J., 19 F.3d at 341. If an action includes claims barred by a state's sovereign immunity, it cannot be removed from state court to federal court because it does not satisfy the requirements of 1441(a)--it is not within the original jurisdiction of the district courts. Gorka v. Sullivan, 82 F.3d 772, 775 (7th Cir.1996). "[I]f even one claim ... is jurisdictionally barred from federal court by a state's sovereign immunity, or does not otherwise fit within the original or supplemental (see 28 U.S.C. § 1367) jurisdiction of the federal courts, then, as a consequence of 1441(a), the whole action cannot be removed to federal court." Frances J., 19 F.3d at 341.
 
 
 19
 However, whether subject matter jurisdiction exists is a question answered by looking at the complaint as it existed at the time the petition for removal was filed. United Farm Bureau Mut. Ins. Co. v. Metropolitan Human Relations Comm'n, 24 F.3d 1008, 1014 (7th Cir.1994) (emphasis added) (citations omitted). Once an action is properly removed from state court to federal court, an amendment of the complaint rendering it outside the federal court's jurisdiction does not defeat the original removal. See Wellness Community Nat'l v. Wellness House, 70 F.3d 46, 50 (7th Cir.1995) (stating that after a defendant removes a case from state to federal court, a plaintiff cannot defeat the federal court's diversity jurisdiction by amending his claim to be an amount less than the required amount in controversy); Hammond v. Terminal R.R. Ass'n of St. Louis, 848 F.2d 95, 97 (7th Cir.1988), cert. denied, 489 U.S. 1032, 109 S.Ct. 1170, 103 L.Ed.2d 229 (1989) (finding that if the complaint states a claim that is removable, removal is not defeated by the fact that, after removal, the plaintiff files a new complaint, omitting the federal claim or stating a claim that is not removable).
 
 
 20
 In this case, Gossmeyer's original complaint filed in state court named all the defendants individually except Farley, whom Gossmeyer named in both his individual and official capacities. Gossmeyer also named the Cook County Sheriff's Department. In addition, Gossmeyer named Four Unknown Officers, but did not specify in what capacity she named them. Judging from the complaint as it existed when Farley filed his petition for removal, there was no Eleventh Amendment bar to removal. At the time he petitioned for removal, Farley was named in his official capacity as an officer of the Cook County Sheriff's Police Department, but a county official is not considered a state official. See Ruehman v. Sheahan, 34 F.3d 525, 528 (7th Cir.1994) (finding that although states and state agencies are shielded by the Eleventh Amendment, counties and municipalities are not); Scott, 975 F.2d at 370 (observing that the Illinois Constitution, art. VII, § 4(c), specifically designates the sheriff as a county officer); see also People ex rel. Davis v. Nellis, 249 Ill. 12, 94 N.E. 165, 169 (1911) (finding that the "sheriff is the principal executive officer of the county"). It was not until after the case was removed that Gossmeyer filed her first amended complaint, in which she named all of the original defendants in both their official and individual capacities. The Eleventh Amendment was therefore not a bar to removal in this case.
 
 
 21
 Gossmeyer's state-law defamation claim for damages against Dilworth in her individual capacity was also properly removed. Title 28 U.S.C. § 1367 provides that
 
 
 22
 in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.
 
 
 23
 Dilworth's anonymous tip to Farley instigated the investigation. It follows that Gossmeyer's defamation claim against Dilworth clearly forms part of the same case or controversy. The claim therefore fell under the district court's supplemental jurisdiction and was properly removed along with the federal claims.
 
 
 24
 We also briefly consider Gossmeyer's state-law defamation claim against Dilworth under state-law sovereign immunity. Frances J. held that if even one claim is jurisdictionally barred from federal court by virtue of a state's sovereign immunity under the Eleventh Amendment or the Hans doctrine or does not otherwise fit within the original or supplemental jurisdiction of the federal courts, then the whole action cannot be removed to federal court. Frances J., 19 F.3d at 341. However, as the State Defendants point out, neither Frances J. nor Gorka considered a pendent state claim that might ultimately be barred by sovereign immunity as it exists under a state's laws, rather than by the Eleventh Amendment or the Hans doctrine. But whether a pendent state law claim is barred by state law regarding sovereign immunity is not so wrapped up with the question of federal jurisdiction that it would affect a defendant's ability to remove his case to federal court. The issue of state-law sovereign immunity is an issue for the Will County Circuit Court to decide when Gossmeyer's state-law claims are heard there once the district court remands the remaining state-law claims to state court.
 
 
 25
 We think that Smith v. Wisconsin Dept. of Agric., 23 F.3d 1134, 1139 (7th Cir.1994), sheds some light on the issue. There, Smith brought a claim against a Wisconsin state agency, alleging that the agency's procedure under dairy farm and safety regulations violated his due process rights. Id. at 1138. The district court found that the agency had sovereign immunity under the Eleventh Amendment and dismissed the claim. Id. Smith argued that the action should have been remanded to state court rather than dismissed. Id. at 1138-39. The agency countered that there was no point in remanding the case because the state court would have dismissed Smith's claim against the agency on the basis of Wisconsin state law on sovereign immunity. Id. at 1139. We stated that "whether a Wisconsin court would entertain Smith's suit against DATCP [the state agency] 'turns on a question of [Wisconsin] law, and we decline to speculate on the proper result.' " Id. (citing International Primate Protection League v. Administrators of Tulane Educ. Fund, 500 U.S. 72, 111 S.Ct. 1700, 114 L.Ed.2d 134 (1991)). We are concerned with whether the district court had supplemental jurisdiction over the defamation claim, and we find that it did. Questions of sovereign immunity under Illinois law would appear to best be left to the Will County Circuit Court, whose determination might prevent the claim from being heard there on remand. The question of state sovereignty under state law is beyond our purposes and would merely constitute impermissible speculation were we to address it.
 
 
 26
 Finally, we must consider that not all of the named defendants signed Farley's petition for removal. A complaint stating a claim falling under federal question jurisdiction may be removed only according to the procedures spelled out in 28 U.S.C. § 1446, unless another statute dispenses with them. Roe v. O'Donohue, 38 F.3d 298, 300 (7th Cir.1994). Section 1446(b) requires that the notice of removal be filed "within thirty days after the receipt by the defendant, through service or otherwise, of a copy of the initial pleading setting forth the claim for relief." Id. A petition for removal is deficient if not all defendants join in it. Id. at 301 (citations omitted). "To 'join' a motion is to support it in writing...." Id. (citations omitted). However, the requirement that all defendants join in the motion may not be necessary if, for example, the non-joining party had not yet been served. Id. But all served defendants still have to support the petition in writing, i.e., sign it.
 
 
 27
 Generally, objections to defects in the removal procedure are waived unless they are made within thirty days after the filing of the notice of removal. 28 U.S.C. § 1447(c); Western Securities Co. v. Derwinski, 937 F.2d 1276, 1279 (7th Cir.1991). "If a case is removed to a court that has original jurisdiction over the type of case, and no objection to removal is lodged, it is as if the plaintiff had sued in the federal district court in the first place." Western Securities, 937 F.2d at 1279. In this case, Farley filed the removal petition within thirty days after receiving Gossmeyer's original complaint. In that petition Farley noted that all properly served defendants agreed to the removal, but not all of these defendants joined in the petition because not all of them signed it. However, this defect in removal procedure was waived because no objection was ever filed. Having found that state sovereignty and defects in removal procedure did not bar the removal of this case, we turn now to the merits.
 
 B. Workplace Searches
 
 28
 We review de novo a district court's 12(b)(6) dismissal. Porter v. DiBlasio, 93 F.3d 301, 305 (7th Cir.1996). We accept as true all facts alleged in the complaint and draw all reasonable inferences from them in the plaintiff's favor. Apostol v. Landau, 957 F.2d 339, 343 (7th Cir.1992). We will affirm the dismissal of a complaint if "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." Ledford v. Sullivan, 105 F.3d 354, 356 (7th Cir.1997) (quoting Hishon v. King & Spalding, 467 U.S. 69, 73, 104 S.Ct. 2229, 2232-33, 81 L.Ed.2d 59 (1984)).
 
 
 29
 Title 42 U.S.C. § 1983 creates a federal cause of action for "the deprivation, under color of [state] law, of a citizen's rights, privileges, or immunities secured by the Constitution and laws of the United States." Id. (quoting Livadas v. Bradshaw, 512 U.S. 107, 132, 114 S.Ct. 2068, 2082-83, 129 L.Ed.2d 93 (1994)). Section 1983 is not itself a source of substantive rights; instead, it is a means for vindicating federal rights conferred elsewhere. Id. (citing Baker v. McCollan, 443 U.S. 137, 144 n. 3, 99 S.Ct. 2689, 2694-95 n. 3, 61 L.Ed.2d 433 (1979)). The initial step in any § 1983 analysis is to identify the specific constitutional right which was allegedly violated. Graham v. Connor, 490 U.S. 386, 394, 109 S.Ct. 1865, 1870-71, 104 L.Ed.2d 443 (1989); Kernats v. O'Sullivan, 35 F.3d 1171, 1175 (7th Cir.1994). Thus, we must decide whether Gossmeyer pleaded any set of facts which could be proven consistent with her allegation that the search of her office, desk, file cabinet, and storage unit violated her Fourth Amendment rights.
 
 
 30
 Gossmeyer contends that the district court's dismissal of Counts I and II of her first amended complaint was based upon the erroneous finding that the search of her office was a workplace search, pursuant to O'Connor v. Ortega, 480 U.S. 709, 107 S.Ct. 1492, 94 L.Ed.2d 714 (1987), and therefore not subject to the traditional probable cause and warrant requirements of the Fourth Amendment. Gossmeyer argues that because her employer conducted the search with the assistance of officers from three separate and unrelated law enforcement agencies, the search of her office, desk, and file cabinet was not pursuant to work-related misconduct, but rather was part of a criminal investigation. As such, Gossmeyer believes that the search should have been subject to a probable cause or warrant standard. Gossmeyer maintains that because the search was done without probable cause and without a warrant, the district court erred in dismissing Counts I and II.
 
 
 31
 In O'Connor v. Ortega, a plurality of the Supreme Court found that a warrant or probable cause standard does not apply when a government employer searches an employee's office, desk, or file cabinet to retrieve government property or to investigate work-related misconduct. Ortega, 480 U.S. at 719-26, 107 S.Ct. at 1498-1502. Instead, a workplace search is legal if it is "reasonable [ ] under all the circumstances." Shields v. Burge, 874 F.2d 1201, 1203 (7th Cir.1989) (quoting Ortega, 480 U.S. at 725-26, 107 S.Ct. at 1501-02). Reasonableness is measured on a case-by-case basis and depends upon balancing the public, governmental, and private interests at stake in a given situation. Shields, 874 F.2d at 1204.
 
 
 32
 We first examine whether Gossmeyer had a reasonable expectation of privacy. Gossmeyer contends that she had an expectation of privacy in her office, filing cabinet, two-door storage unit, and desk because she bought the unit and filing cabinet herself and had exclusive control over them with lock and key. She also notes that she maintained her desk with a lock and key. However, Gossmeyer herself points out that in the two cabinets she stored evidentiary photographs, files, documents, work-related sundries, and some personal items. Most of the contents were work-related items, and Gossmeyer was the subject of a work-related investigation. In Ortega, the Court found that the "workplace" includes "those areas and items that are related to work and are generally within the employer's control." Ortega, 480 U.S. at 715, 107 S.Ct. at 1496-97. Gossmeyer is correct that the "workplace" does not necessarily include closed personal containers, such as locked luggage or purses, that just happen to be in the workplace. See id. at 716, 107 S.Ct. at 1497. But we fail to find an expectation of privacy in the cabinets simply because Gossmeyer bought them herself. The cabinets were not personal containers which just happened to be in the workplace; they were containers purchased by Gossmeyer primarily for the storage of work-related materials. Gossmeyer herself stated that she bought them because of a lack of storage space. Also, Carla Hay had at least a key to the two-door storage unit, which she opened for Heath and Jesse. Gossmeyer's desk, which she did not purchase, also likely had work-related materials in it. Gossmeyer had no constitutionally-protected privacy interest in her desk, two-door storage unit, or filing cabinet. These items were part of the "workplace," not part of Gossmeyer's personal domain.
 
 
 33
 A workplace search is reasonable if it is "justified at its inception" and if it is "reasonably related in scope to the circumstances" that prompted the search. Ortega, 480 U.S. at 726, 107 S.Ct. at 1502 (citation omitted); Shields, 874 F.2d at 1202. If there are reasonable grounds to believe that the search will uncover evidence of the employee's misconduct, the search is "justified at its inception." Ortega, 480 U.S. at 726, 107 S.Ct. at 1502; Shields, 874 F.2d at 1202. The search is reasonable in scope if the measures taken by the employer are reasonably related to the search's objective and they are not overly intrusive in light of the nature of the alleged misconduct. Id.
 
 
 34
 In this case, the search met both prongs of the Ortega test. The search was justified at its inception. Although the tip may have been anonymous, it showed sufficient signs of reliability. The informant identified herself as one of Gossmeyer's co-workers in the Joliet office; made serious and specific allegations of misconduct--that Gossmeyer had pornographic pictures of children; and stated where those pictures could be found--in Gossmeyer's file cabinets and desk. The search took place one day after Farley received the tip and passed it on to the OIG. In addition, there was reason to believe that Gossmeyer's cabinets were more likely than most to contain such pictures. She had unusual access to children and extraordinary authority (conferred by the state) to take such pictures.
 
 
 35
 This is a great deal more than investigators in Shields had. In Shields, we were concerned that the sparse record did not establish the nature of the tip, the reliability of the informant, the extent to which the tip was corroborated, or any other facts which might have led investigators to suspect that Shields was involved in any misconduct. Shields, 874 F.2d at 1204. For example, the investigators had no idea who the informants were or whether their information came from first-hand knowledge. Id. at 1205. We were also concerned that the search took place several months after investigators received the anonymous tip. Id. at 1204-05. In Shields, we did not reach the issue of the search's justification because we affirmed the district court's 12(b)(6) dismissal on the stronger grounds of qualified immunity. Id.
 
 
 36
 We must also consider that Gossmeyer's position as a child protective investigator involved in gathering photographic evidence of abuse or neglect. Because Gossmeyer was the only person in the office who took and stored pictures of abused children, the search could be viewed as either justified or unjustified at its inception. Her sensitive position gave Gossmeyer opportunity to commit the alleged misconduct, but her position also offered an innocuous explanation as to why she had the pictures of children in her files--as photographic evidence and nothing more. However, the search was prompted by serious allegations of specific misconduct against an employee in a sensitive position. These allegations called for prompt attention and, overall, we find that the search was justified at its inception.
 
 
 37
 We also find that the search was reasonable in scope. The targets of the search were those places where Gossmeyer would likely store the alleged pornographic pictures. Heath and Jesse, who both worked for DCFS, told Carla Hay to unlock Gossmeyer's two filing cabinets and her desk. Hay was able to open the two-door storage unit, but did not have a key for the four-drawer filing cabinet or desk. The men then forcibly opened Gossmeyer's desk and the file cabinet with tools. They searched the desk and cabinets and removed certain items. They may have been sloppy in the search and may not have preserved the exact order in which items were filed, but their search did not extend to places where the pictures would not reasonably have been found.
 
 
 38
 We gather that Gossmeyer's concern with the search was not so much its scope but rather the manner in which it was undertaken. One day after he received the tip about Gossmeyer, Heath, an investigator for OIG, called the Joliet office at 4:55 p.m. and instructed Carla Hay to vacate all staff from the office. By 5:05, Heath was at the door of the office with six other people from three different agencies. However, only Heath, an OIG investigator and Jesse, who likely worked for DCFS in some capacity, searched Gossmeyer's office. Heath and Jesse directed Farley and two unknown officers to detain Hay in her office and directed Barrows and another unknown officer to detain Walsh so that Heath and Jesse could conduct their search without interference.
 
 
 39
 The presence of so many officials might seem excessive, but their presence did not transform an agency's work-related search into a criminal search requiring probable cause and a warrant. The government's and the public's interest in this case is significant. The OIG is statutorily charged with conducting "investigations into allegations of or incidents of possible misconduct, misfeasance, malfeasance, or violations of rules, procedures, or laws by any employee" of DCFS. See 20 ILL. COMP. STAT . 505/35.5(a). In conducting its investigations, the OIG has "access to all information and personnel necessary to perform the duties of the office." See 20 ILL. COMP. STAT . 505/35.5(b). The presence of the other officials may be explained by another statute dealing with allegations of misconduct. That statute provides:
 
 
 40
 The Inspector General shall be the primary liaison between the Department and the Department of the State Police with regard to investigations conducted under the Inspector General's auspices. If the Inspector General determines that a possible criminal act has been committed or that special expertise is required in the investigation, he or she shall immediately notify the Department of State Police. All investigations conducted by the Inspector General shall be conducted in a manner designed to ensure the preservation of evidence for possible use in a criminal prosecution.
 
 
 41
 20 ILL. COMP. STAT . 505/35.5(c) (emphasis added). The Inspector General's Office is required to notify the state police if it determines that a criminal act has been committed or that special expertise is required. The statute does not require the presence of the Illinois State Police, although Barrows and Sebak, both state police officers, were present here. We do not know why there were other law enforcement officials present. Believing that special expertise was required, the OIG may have notified the state police and the police, in turn, could have contacted Farley, a nationally-recognized expert on child abuse, child sexual abuse, and child pornography. Farley then may have decided to bring along Bohling, who also worked for the Cook County Sheriff's Office. The state police may have contacted Williams, a federal postal inspector, for his expertise because his office often deals with pornography that finds its way through the mail system.
 
 
 42
 But enough speculation. Gossmeyer's complaint is all we have to go on, and it does not offer any explanations. It is not required to do so. As far as the scope of the search is concerned, we find it most significant that Gossmeyer's complaint states that of all these officials, only DCFS personnel, Heath and the mysterious Jesse, actually conducted the search. When they finished their search, Heath and Jesse called Farley into Gossmeyer's office and Farley dismissed the pictures as being nothing more than work-related evidence. That is the extent to which the outside officials "participated" in the search.
 
 
 43
 Case law also instructs that the presence of outside law enforcement officials and the possibility of the search leading to criminal charges against Gossmeyer did not inevitably convert the search into a criminal search requiring probable cause and a warrant. In United States v. Nechy, compliance investigators from the DEA conducted a search of a pharmacy which they believed to be in violation of a state civil statute. 827 F.2d 1161, 1163 (7th Cir.1987). Specifically, DEA compliance investigators believed that something was amiss because the pharmacy was ordering immense quantities of Talwin, a controlled substance, without keeping records of the purchases. Id. Pursuant to a civil record-keeping and inspection statute, the DEA investigators applied for an administrative warrant. Id. The statute, however, did not require the investigators to show probable cause to believe that the search would uncover any evidence of a criminal violation. Id. The compliance investigators brought along three Milwaukee narcotics detectives, ostensibly for protection because compliance investigators are never armed, the pharmacy was in a dangerous neighborhood, and the pharmacist under investigation, Nechy, was known to carry a gun. Id. at 1164. Once the crew arrived at the pharmacy, however, the detectives helped in collecting and bundling evidence and one uniformed police officer stopped by to take pictures. Id.
 
 
 44
 On appeal, Nechy argued that one compliance investigator's motive in conducting the search was to gather evidence for a criminal prosecution and that this motive tainted an ostensibly administrative search. Id. at 1166. He also argued that the detectives' participation tainted the search. Id. at 1167. We observed that the participation of police in a civil search may seem troubling, but we ultimately found that "civil process [was] being used to enforce a civil recordkeeping requirement, albeit one that is ancillary to a scheme of criminal law enforcement." Id. We noted that the purpose of the record-keeping requirement made it inevitable that government agencies enforcing it would hope to acquire evidence for use in criminal proceedings. Id. However, we concluded that the case "came within the general rule that if a search is objectively reasonable, the motives of the officers conducting it will not turn it into a violation of the Fourth Amendment." Id.
 
 
 45
 Just as Nechy was an objectively reasonable administrative search not subject to the more rigorous requirements of a warrant showing probable cause, the search of Gossmeyer's office was an objectively reasonable workplace search. Although the compliance investigators in Nechy had a warrant, it was an administrative warrant required by statute. No showing of probable cause to believe that the search would turn up evidence of a criminal violation was required before the warrant could be issued. Here, we have a stronger case than in Nechy, because the applicable DCFS statutes do not require a warrant, and the assembled law enforcement officials here never participated in the search.[2] Even after the search was over, Farley entered Gossmeyer's office only to assess the nature of the photographs which Heath and Jesse had uncovered during the search.
 
 
 46
 In Shields v. Burge, we applied Ortega even though Shields was a police narcotics investigator suspected of unlawfully transferring marijuana to a confidential informant and illegally giving information about an ongoing narcotics investigation to one of the investigation's targets. 874 F.2d at 1202. Internal affairs officers searched Shields' desk without a warrant as part of an ongoing internal investigation which paralleled a separate criminal investigation. Id. As part of its internal investigation aimed solely at discovering whether Shields had violated state police rules and regulations, internal affairs could have uncovered something violative of both police procedure and criminal law. Despite this possibility, we still applied Ortega.
 
 
 47
 We also recall that in her first amended complaint, Gossmeyer alleged that Farley believed that the anonymous tip was from a disgruntled employee and did not warrant action by law enforcement officials. That was why Farley called the OIG to relay the tip instead of the police. Even assuming that Heath and Jesse got a little heavy-handed in effectuating the search, their actions do not preclude an Ortega analysis. In sum, we find that Heath and Jesse's search of Gossmeyer's office, desk, filing cabinet, and storage unit was a reasonable workplace search.
 
 
 48
 We must also consider that Gossmeyer has filed a claim against Heath in his official capacity. This constitutes a claim against DCFS. Scott, 975 F.2d at 369. DCFS is a state agency, and, therefore, this official capacity claim is a claim against the State of Illinois. Id. As such, it is barred by the Eleventh Amendment, absent a waiver by Illinois or congressional override. Id. Finding neither waiver nor congressional override, we remand this claim to the district court with instructions that it be remanded to the Will County Circuit Court.
 
 C. The Remaining Defendants
 
 49
 Having found no cognizable Fourth Amendment allegation, we examine basic principles underlying § 1983 liability for those officials who were either not present for or did not participate in the search. First, Gossmeyer brought a § 1983 claim against Michael Sheahan in his official capacity as Cook County Sheriff. She alleged that the Sheriff's Office has a policy that allows officers to assist other agencies in investigations of abuse. Gossmeyer argued that inadequate training can be inferred from the facts alleged because the Sheriff's policy permitted Farley and Bohling to participate in a warrantless search of Gossmeyer's office to gather evidence for a criminal prosecution against her. Gossmeyer apparently concedes that Farley and Bohling did not actually perform the search, but she argues that they had an opportunity to intervene to prevent the harm caused by Heath and Jesse, and this failure to intervene is actionable under Yang v. Hardin, 37 F.3d 282, 285 (7th Cir.1994).
 
 
 50
 An official capacity claim against an individual defendant constitutes a claim against the government entity itself. Rascon v. Hardiman, 803 F.2d 269, 274 (7th Cir.1986). Gossmeyer's claim against Sheahan is therefore a claim against the Cook County Sheriff's Department. Municipalities and other local government units cannot be liable under § 1983 on a respondeat superior theory, but can be liable if action pursuant to an official policy or custom of the municipality or government unit causes a constitutional tort. Lanigan v. Village of East Hazel Crest, Ill., 110 F.3d 467, 478 (7th Cir.1997) (citing Monell v. Department of Social Serv., 436 U.S. 658, 690-91, 98 S.Ct. 2018, 2035-36, 56 L.Ed.2d 611 (1978); Sivard v. Pulaski County, 17 F.3d 185, 188 (7th Cir.1994)).
 
 
 51
 Here, the Sheriff's Department cannot be found liable because Farley and Bohling's actions did not constitute, nor did they cause, a constitutional tort. The case Gossmeyer relies on, Yang v. Hardin, provides:
 
 
 52
 An officer who is present and fails to intervene to prevent other law enforcement officers from infringing the constitutional rights of citizens is liable under § 1983 if that officer had reason to know: (1) that excessive force was being used, (2) that a citizen has been unjustifiably arrested, or (3) that any constitutional violation has been committed by a law enforcement official; and the officer had a realistic opportunity to intervene to prevent the harm from occurring.
 
 
 53
 37 F.3d at 285 (citing Anderson v. Branen, 17 F.3d 552, 556 (2d Cir.1994)). Presumably Gossmeyer believes that Farley and Bohling are liable under the third category of Yang. We have already found that those who actually performed the search, Heath and Jesse (who were DCFS employees, not law enforcement officials), did not violate the Fourth Amendment. Farley and Bohling cannot be found liable for failing to stop a reasonable workplace search. Sheahan and the Sheriff's Office, in turn, cannot be held liable because the actions of Farley and Bohling do not constitute a cognizable constitutional violation.
 
 
 54
 A similar rationale holds true for the Bivens charges against the United States based on the mere sidelines "actions" of Postal Inspector Williams. In order to state a cause of action under Bivens, the plaintiff must allege facts which show that the individual defendant was personally involved in the deprivation of the plaintiff's constitutional rights. See Black v. Lane, 22 F.3d 1395, 1401 (7th Cir.1994). "[A]n official meets the 'personal involvement' requirement when she acts or fails to act 'with a deliberate or reckless disregard of plaintiff's rights or if the conduct causing the constitutional deprivation occurs at her direction or with her knowledge and consent.' " Id. (citation omitted). Like Bohling and Farley, Williams cannot be held liable because he did not participate in the search (which was legal anyway). Nor can he be held liable for failure to intervene during a reasonable workplace search.
 
 
 55
 Illinois State Police officers Sebak and Barrows likewise cannot be held individually liable. They did not participate in the search and cannot be held liable for failure to intervene during a reasonable workplace search. A suit against officers Sebak and Barrows in their official capacities is a suit against the Illinois State Police. See Scott v. O'Grady, 975 F.2d 366, 369 (7th Cir.1992). The Illinois State Police is a state agency, and, therefore, these official capacity claims are claims against the State of Illinois. Id. As such, they are barred by the Eleventh Amendment, absent a waiver by Illinois or congressional override. Id. Finding neither waiver nor congressional override, we remand these claims to the district court with instructions that they be remanded to the Will County Circuit Court.
 
 
 56
 Next, we consider Gossmeyer's § 1983 claims against McDonald, Terry, Kane, Smith, and Dilworth in their individual and official capacities. The doctrine of respondeat superior cannot be used to impose § 1983 liability on a supervisor for the conduct of a subordinate violating a plaintiff's constitutional rights. Lanigan, 110 F.3d at 477 (citations omitted). However, we will find supervisory liability if the supervisor, with knowledge of the subordinate's conduct, approves of the conduct and the basis for it. Id. We reiterate that personal involvement is a prerequisite for individual liability in a § 1983 action. Wolf-Lillie v. Sonquist, 699 F.2d 864, 869 (7th Cir.1983) (finding that an individual cannot be held liable in a § 1983 action unless he caused or participated in an alleged constitutional deprivation). Supervisors who are simply negligent in failing to detect and prevent subordinate misconduct are not personally involved. See Lanigan, 110 F.3d at 477. "Rather, 'supervisors must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see. They must in other words act either knowingly or with deliberate, reckless indifference.' " Id. (quoting Jones v. City of Chicago, 856 F.2d 985, 992-93 (7th Cir.1988)).
 
 
 57
 Here, McDonald is the Director of DCFS, Terry is the Executive Deputy Director, Kane is the Inspector General, Smith is the Chief Investigator for the OIG, and Dilworth is Gossmeyer's co-worker. First, we reiterate that Heath and Jesse's search was not unconstitutional. Secondly, none of these defendants was present during the search and, therefore, had no personal involvement in it. Even assuming the search deprived Gossmeyer of her constitutional rights, none of these defendants was present to turn a blind eye.
 
 
 58
 The claims against the DCFS employees in their official capacities are claims against DCFS. Scott, 975 F.2d at 369. DCFS is a state agency, and, therefore, these official capacity claims are claims against the State of Illinois. Id. As such, they are barred by the Eleventh Amendment, absent a waiver by Illinois or congressional override. Id. Finding neither waiver nor congressional override, we remand these claims to the district court with instructions that they be remanded to the Will County Circuit Court.
 
 
 59
 Finally, having found no constitutional violation resulting from the search of Gossmeyer's office, we necessarily find that Count II's conspiracy allegation fails as well.
 
 D. Qualified Immunity
 
 60
 Moreover, all defendants involved are entitled to the defense of qualified immunity, which they raised in their motions to dismiss. Qualified immunity is an affirmative defense which may be raised in a motion to dismiss, but we consider only the facts alleged in the complaint, which we must accept as true. Lanigan, 110 F.3d at 471. Under the defense of qualified immunity, "government officials performing discretionary functions are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Id. at 471-72 (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982)). A right is clearly established when its contours are sufficiently clear so that a reasonable official would realize that what he is doing violates that right. Shields, 874 F.2d at 1205 (citing Anderson v. Creighton, 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987)). This does not mean that there has to be a case on point holding that the officials' exact conduct is illegal before we will find the officials liable; however, "in the light of preexisting law the unlawfulness must be apparent." Id. (quoting Anderson, 483 U.S. at 640, 107 S.Ct. at 3039).
 
 
 61
 Gossmeyer bears the burden of demonstrating that the constitutional right allegedly violated was clearly established "before the defendant[s] acted or failed to act." Casteel v. Pieschek, 3 F.3d 1050, 1053 (7th Cir.1993). This requires the plaintiff to point to either a closely analogous case or evidence that the defendants' conduct is so violative of the constitutional right that reasonable officials would know that their conduct was unconstitutional without guidance from courts. Id. We review de novo whether a plaintiff has a clearly established statutory or constitutional right for purposes of qualified immunity. See Maltby v. Winston, 36 F.3d 548, 554 (7th Cir.1994), cert. denied, 515 U.S. 1141, 115 S.Ct. 2576, 132 L.Ed.2d 827 (1995).
 
 
 62
 It was certainly not clearly established at the time of the search that the search was unlawful. In August 1994, the defendants chiefly had Ortega to guide them. In Ortega, a plurality of the Supreme Court looked at the same two issues before us: whether a public employee had a reasonable expectation of privacy in his office, desk, and file cabinets in his workplace and what is the appropriate Fourth Amendment standard for a search conducted by a public employer in areas where a public employee is found to have reasonable expectation of privacy. Ortega, 480 U.S. at 712, 107 S.Ct. at 1494-95. The plurality stated that the reasonableness of an expectation of privacy differs according to the context. Id. at 715, 107 S.Ct. at 1496-97.
 
 
 63
 The plurality acknowledged that in the workplace context, it has found that employees may have a reasonable expectation of privacy against police intrusions. Id. at 716, 107 S.Ct. at 1497 (citing Mancusi v. DeForte, 392 U.S. 364, 88 S.Ct. 2120, 20 L.Ed.2d 1154 (1968)). But the plurality also realized that "[t]he operational realities of the workplace ... may make some employees' expectations unreasonable when an intrusion is by a supervisor rather than a law enforcement official." Id. at 717, 107 S.Ct. at 1497. Public employees' privacy expectations in their offices, desks, and filing cabinets may be diminished by office practices and procedures or by legitimate regulation. Id. The plurality noted that even Mancusi suggested that the plaintiff-employee did not have a reasonable expectation of privacy against intrusions by his union supervisor. Id. The plurality observed that given the variations of work environments in the public sector, an employee's reasonable expectation of privacy must be assessed on a case-by-case basis. Id. at 718, 107 S.Ct. at 1498.
 
 
 64
 Ortega had a reasonable expectation of privacy because Ortega did not share his desk or file cabinets with any other employees; Ortega had his own files in his office, most of which did not relate directly to his work at the hospital; and the only items recovered by hospital investigators were private in nature. In this case, Gossmeyer did not share her file cabinet, storage unit, or desk with other DCFS personnel. She bought the cabinet and storage unit at her own expense because the office had inadequate space. The contents of Gossmeyer's desk and cabinets primarily consisted of files and evidentiary photographs for use by DCFS. Heath and Jesse primarily recovered work-related materials. Hay had a key to Gossmeyer's storage unit, and she opened the unit for Heath. From Ortega, there was room for Heath and Jesse to think that Gossmeyer lacked a privacy interest in her office, desk, and cabinets.
 
 
 65
 As for the reasonableness of the search, the plurality in Ortega observed that there is surprisingly little case law on what is reasonable in a public employer's work-related search of its employee's office, desk, or file cabinets. Id. at 721, 107 S.Ct. at 1499-1500. The plurality stressed that "[i]t is important to recognize the plethora of contexts in which employers will have an occasion to intrude to some extent on an employee's expectation of privacy." Id. at 723, 107 S.Ct. at 1500. The plurality cautioned that
 
 
 66
 [b]ecause the parties in this case have alleged that the search was either a noninvestigatory work-related intrusion or an investigatory search for evidence of suspected work-related employee misfeasance, we undertake to determine the appropriate Fourth Amendment standard of reasonableness only for these two types of employer intrusions and leave for another day inquiry into other circumstances.
 
 
 67
 Id.
 
 
 68
 The search of Gossmeyer's office, desk, storage unit, and filing cabinet was an investigatory search for evidence of suspected work-related employee misfeasance. The defendants' search should therefore be subject to Ortega's reasonableness test. We have already found that the search was justified at its inception and reasonable in scope. But even if the search arguably is not subject to Ortega, and the Court in Ortega actually left for another day its resolution of the reasonableness of the kind of search done in this case, it would not have been so evident to the defendants that their search was unreasonable. Added to the mix is a closely analogous case, Shields v. Burge. In Shields, this Court applied Ortega to a work-related search prompted by allegations of work-related misconduct which was potentially violative of both internal policy and criminal law. With Ortega and Shields as their guideposts, the unlawfulness of any of the named defendants' conduct would not, and should not, have been readily apparent to them.
 
 
 69
 In sum, Heath and Jesse's workplace search did not violate the Fourth Amendment. Even if they arguably violated the Fourth Amendment, all of the defendants are protected by qualified immunity. With no constitutional violation underlying Gossmeyer's § 1983 claims, her remaining state-law claims necessarily fall by the wayside and are remanded to the district court with instructions to remand them to the Will County Circuit Court.
 
 Conclusion
 
 70
 For the foregoing reasons, the district court's dismissal of Counts I and II as to all defendants and Counts III and IV as to the United States is A FFIRMED. The district court's remand of Counts III, IV and V to the Will County Circuit Court as to the remaining defendants is also A FFIRMED. We also R EMAND the official capacity claims against Illinois State Police officers Barrows and Sebak and the official capacity claims against DCFS personnel McDonald, Terry, Kane, Smith, Dilworth, and Heath to the district court with instructions that they be remanded to the Will County Circuit Court.
 
 
 
 [1]
 At oral argument, Gossmeyer's counsel stated that Jesse may have worked for the OIG, but that he still did not know Jesse's exact identity. Gossmeyer's counsel stated that, for all he knew, Jesse might even be a neighbor
 
 
 [2]
 Nechy does not, of course, give a blanket authorization for a legislature or administrative agency to override the protections afforded by the Fourth Amendment. It emphasized the heavily regulated nature of the industry (there, pharmaceuticals) and the legitimacy of administrative inspections to assure compliance with the regulatory regime. 827 F.2d at 1161. Here, too, we are dealing with an activity, child protection, and a setting, the government workplace, that similarly support the government's reasonable access for the purposes of assuring that all relevant rules and regulations are being followed. The rationale of Nechy and the cases it cited on warrantless administrative searches therefore apply to Gossmeyer's situation as well