**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 15a0012n.06

**Case No. 14-1151**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

|  |  |  |
|---|---|---|
| SYLVIA JAMES, | ) | **FILED**<br>Jan 07, 2015<br>DEBORAH S. HUNT, Clerk |
|  | ) |  |
| Plaintiff-Appellant, | ) |  |
|  | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
|  | ) | COURT FOR THE EASTERN |
| HILLIARD HAMPTON, et al., | ) | DISTRICT OF MICHIGAN |
|  | ) |  |
| Defendants-Appellees. | ) |  |
|  | ) |  |
|  | ) | O P I N I O N |

BEFORE:     COLE, Chief Judge; KEITH and BATCHELDER, Circuit Judges.

COLE, Chief Judge.  Sylvia James, a former Michigan state court judge, was removed from the bench by the Michigan Supreme Court in 2012 after the state Judicial Tenure Commission ("JTC") investigated her for financial and other misconduct and recommended her removal.  While the investigation was ongoing, James sued the JTC and other state and local officials under 42 U.S.C. § 1983, alleging violations of (1) her Fourth Amendment rights under the United States Constitution stemming from a search of her courthouse office and personal safe and (2) her Fourteenth Amendment equal protection rights under the United States Constitution because the JTC chose not to recommend the discipline of several white Michigan state court judges who also engaged in judicial misconduct.  She also alleged various state law claims.

The district court declined to exercise supplemental jurisdiction over the state law claims and dismissed the federal claims under the *Younger* abstention doctrine because the JTC proceedings against James were ongoing. A panel of our court reversed the district court's dismissal of the complaint, finding that abstention was proper but that the case should have been stayed instead. On remand, the district court again dismissed the federal claims, this time for failure to state a claim for relief, and declined to reconsider its decision not to exercise supplemental jurisdiction over the state claims. James now appeals the dismissal of her federal claims as well as the decision not to exercise supplemental jurisdiction. For the following reasons, we reverse the district court's dismissal of James's Fourth and Fourteenth Amendment claims and affirm the dismissal of her state claims.

## I.     BACKGROUND

In reviewing a district court's grant of a motion to dismiss, we construe the complaint in the light most favorable to the plaintiff and accept all allegations as true. *Pedreira v. Ky. Baptist Homes for Children, Inc.*, 579 F.3d 722, 727 (6th Cir. 2009). Plaintiff-Appellant Sylvia James, an African-American woman, served as the sole judge of the 22nd District Court in Inkster, Michigan, for more than 23 years. In 2010, the Inkster City Council, the funding unit for the 22nd District Court, hired attorney David Jones to investigate James, and in February 2011 he filed a grievance against her with the JTC alleging that James abused her office. Due to Jones's grievance, the JTC conducted an investigation to determine whether a formal complaint and hearing was warranted.

The Michigan Constitution authorizes the nine-member JTC to oversee the discipline of Michigan's judiciary. Mich. Const. art. VI, § 30. The JTC investigates grievances against judges in order to determine whether to file a formal complaint. Mich. Ct. R. 9.207(B). If the

JTC files a formal complaint, it then conducts a hearing on the matter. Mich. Ct. R. 9.210(A). The Michigan Supreme Court may appoint a master to conduct the hearing and issue a report of his or her findings. Mich. Ct. R. 9.210(B); 9.214. By majority vote, the JTC may then recommend to the Michigan Supreme Court that a judge be removed from office or otherwise disciplined. Mich. Ct. R. 9.220(A). The court then considers the recommendation of the JTC as well as a petition and brief submitted by the judge being investigated if she so chooses. Mich. Ct. R. 9.224. Finally, the court files an opinion and judgment, which may accept, reject, or modify the recommendations of the JTC, or orders further evidence to be taken. Mich. Ct. R. 9.225.

During the course of the investigation of the grievance against James, the Michigan Supreme Court voted to place her on administrative leave on April 13, 2011. Compl., R. 1-2, PageID 68. In May 2011, James met with Defendant Green, the regional administrator for the Michigan Supreme Court Administrator's Office, to discuss procedures associated with her administrative leave, and she told Green that her safe and office contained personal documents. Green told James that "she would not allow the violation of [James's] privacy rights and that no one would open her personal safe outside of her presence." Compl., R. 1, PageID 7. Sometime after this meeting, Defendants Green and Washington, James's replacement as chief judge of the 22nd District Court, searched James's office and safe. James alleges that on June 14, 2011, documents seized during the search were provided to the JTC, but she did not learn of the search until after it was completed. James further alleges that, sometime before the JTC filed its formal complaint, she was allowed one hour to enter her office and retrieve items. When she entered the office, she found that "locks to her personal safe had been dismantled and that many of the documents that would be exculpatory were missing from her office and safe." *Id.* at 9.

On October 26, 2011, the JTC filed a formal complaint against James alleging financial, administrative, and employment improprieties, as well as misrepresentations to the JTC during the investigation. *In re James*, 492 Mich. 553, 558, 821 N.W.2d 144, 148 (2012). In December, the Michigan Supreme Court suspended James with pay and appointed a master, who conducted a formal hearing from January 23, 2012 until March 1, 2012. *Id.*

Three days before the hearing began, James filed this 42 U.S.C. § 1983 action in the United States District Court for the Eastern District of Michigan, asserting violations of her federal constitutional rights by the following two groups of defendants: (1) Hilliard Hampton, mayor of the City of Inkster; the City of Inkster; David Jones, attorney for the City of Inkster; and Pamela Anderson, court administrator for the 22nd District Court (collectively, "Inkster Defendants"); and (2) Deborah Green, regional administrator for the Michigan Supreme Court Administrator's Office; the JTC; Paul Fischer, executive director of the JTC; and Valdemar Washington, chief judge of the 22nd District Court (collectively, "State Defendants"). She further alleged state claims of defamation (against Hampton), the right to privacy (against the State Defendants), replevin for the return of her documents (against the State Defendants), and violations of the Michigan Court Rules (against the State Defendants). She also sought a temporary restraining order ("TRO") against the JTC proceedings.

Specifically, James argued that both the Inkster and State Defendants violated her Fourth Amendment right to be free from unreasonable searches and seizures when they searched her office and broke into her locked personal safe without a warrant or a showing of probable cause. James further contended that these documents were provided to Fischer, the JTC executive director, and to the JTC for use in the investigation against her. Finally, James claimed that

Anderson, the court administrator for the 22nd District Court, removed and/or destroyed exculpatory evidence from her safe and office.

James also contended that the JTC and Fischer denied her the equal protection of the law guaranteed by the Fourteenth Amendment by disciplining her while failing to initiate disciplinary proceedings against five white Michigan state court judges who had engaged in serious judicial misconduct. The misconduct of those judges consisted of the following: (1) improper personal contact with a litigant in a divorce case, resulting in an improper termination and subsequent pay-off of the court administrator who reported the contact (Judge Stowe); (2) retaliatory termination of a court employee for living with her fiancé and of another employee who complained the judge interrogated him about his religious beliefs (Judge Somers); (3) improperly terminating a whistleblower-employee (Judge Kandrevas); and (4) conspiring to fire a court employee for allegedly embarrassing the wife of one of the judges (Judges Baron and Small). All five of the judges faced civil lawsuits that ended either in settlement or jury verdicts unfavorable to them. The JTC did not pursue disciplinary action against any of the judges.

The district court denied James's motion for a TRO and also declined to exercise supplemental jurisdiction over James's state law claims. The court then dismissed James's remaining federal claims on the grounds that the abstention doctrine articulated in *Younger v. Harris*, 401 U.S. 37 (1971), required it to refrain from ruling on the claims while the state proceedings remained ongoing.

James appealed the district court's dismissal of her federal claims. In her opening brief she did not challenge the court's decision not to exercise jurisdiction over her state law claims, but she later contended in her reply brief that she had not waived the issue. Our court addressed only the issue of *Younger* abstention, concluding that abstention was proper but reversing and

remanding because the district court should have stayed, rather than dismissed, the case given that James sought monetary damages in addition to equitable relief. *James v. Hampton*, 513 F. App'x 471 (6th Cir. 2013).

While her appeal was pending before this court, the JTC proceedings against James concluded. The master issued a report on April 23, 2012, finding that James had committed judicial misconduct, and on June 11, 2012, the JTC adopted all but one of the master's findings and recommended that James be removed from office. *In re James*, 492 Mich. at 558–59, 821 N.W.2d at 148. On July 31, 2012, the Michigan Supreme Court adopted the recommendation of the JTC that James be removed from office for the remainder of her term. *Id.* at 555, 821 N.W.2d at 146. The court determined that "[a]lthough some of her misconduct, considered in isolation, does not justify such a severe sanction, taken as a whole her misconduct rises to a level that requires her removal from office." *Id.* at 556, 821 N.W.2d at 147.

After James's removal from the bench and the remand to district court, both the Inkster Defendants and State Defendants filed motions to dismiss. The district court dismissed James's Fourth Amendment claim under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim for relief, applying the Supreme Court's holding in *O'Connor v. Ortega*, 480 U.S. 709, 726 (1987), that a public employer's warrantless search of an employee does not violate the Fourth Amendment if it is reasonable at its inception and in its scope. The district court observed that James's complaint was "devoid of any allegations alleging how or why the search was unreasonable in terms of inception and scope," and found that the ongoing investigation against James justified the search. *James v. Hampton*, No. 12-10273, 2013 WL 6839136, at *5 (E.D. Mich. December 27, 2013).

The district court also dismissed James's Fourteenth Amendment equal protection claim. It concluded that James had failed to establish a *prima facie* case of discrimination because she could not show that she and any of the five white judges were similarly situated. In support of its conclusion, the court pointed to the fact that James had been disciplined for *four* counts of judicial misconduct, including: (1) misappropriating public funds; (2) denying citizens access to court by enforcing a business-attire policy; (3) employing a family member in violation of the Michigan Supreme Court's anti-nepotism policy; and (4) making misrepresentations to the JTC during the investigation and hearing. *Id.* at *7. The district court further stressed that the transgressions of three of the white judges (the court did not mention the other two judges identified in James's complaint) were not of "comparable seriousness" to James's conduct, and that James offered only "scant details" of the other judges' misconduct. *Id.*

The district court also pointed out that it had previously declined to exercise supplemental jurisdiction over James's state law claims and that the issue was neither appealed to nor addressed by this court on appeal. *Id.* at *2. Therefore, it declined to address the issue further.

James now appeals the order dismissing her Fourth and Fourteenth Amendment claims, as well as the district court's decision to decline to exercise supplemental jurisdiction over her state law claims.

## II. ANALYSIS

### A. Standard of Review

Our review of a district court's dismissal of a claim under Federal Rule of Civil Procedure 12(b)(6) is *de novo*. *Pedreira*, 579 F.3d at 727. We construe the complaint in the light most favorable to the plaintiff and accept all allegations as true. *Keys v. Humana, Inc.*,

684 F.3d 605, 608 (6th Cir. 2012). However, the plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). We review the district court's decision to decline to exercise supplemental jurisdiction for abuse of discretion. *Gamel v. City of Cincinnati*, 625 F.3d 949, 951 (6th Cir. 2010). A district court abuses its discretion when the reviewing court has "the definite and firm conviction that the district court made a clear error of judgment in its conclusion upon weighing relevant factors." *Id.* (quoting *Gaeth v. Hartford Life Ins. Co.*, 538 F.3d 524, 528–29 (6th Cir. 2008)).

### B. Fourth Amendment Claim

Although warrantless searches are presumptively unreasonable under the Fourth Amendment, the Supreme Court has recognized an exception for searches of a public employee's workplace under the special needs doctrine. *See O'Connor*, 480 U.S. at 719–20. In *O'Connor*, the Court reasoned that a warrant requirement would be impracticable in the public employment context because such a requirement would seriously disrupt the routine business of the workplace. *Id.* at 722. A plurality of the *O'Connor* Court thus laid out a two-step inquiry to determine whether a public employee workplace search without a warrant would violate the Fourth Amendment. First, a court must determine whether the employee has a reasonable expectation of privacy in the workplace. *Id.* at 711–12. Second, if the employee does have an expectation of privacy, the warrantless search must be reasonable both at its inception and in its scope. *Id.* at 725–26. A search is justified at its inception "when there are reasonable grounds for suspecting that the search will turn up evidence that the employee is guilty of work-related misconduct, or that the search is necessary for a noninvestigatory work-related purpose such as to retrieve a needed file." *Id.* at 726. The search is reasonable in scope when it is "reasonably

related to the objectives of the search and not excessively intrusive in light of . . . the nature of the [misconduct]." *Id.* (alterations in original).

### *1. Reasonable Expectation of Privacy*

The *O'Connor* plurality disagreed with the four dissenters and Justice Scalia, who wrote a concurring opinion, about when a public employee has a reasonable expectation of privacy. The plurality used an "operational realities" test to determine whether Fourth Amendment rights are implicated in a specific workplace context, reasoning that "some government offices may be so open to fellow employees or the public that no expectation of privacy is reasonable." *Id.* at 717–18. Justice Scalia concluded that the offices of government employees, as a general matter, were covered by the Fourth Amendment but that employer investigations of violations of workplace rules that would be regarded as reasonable in the private sector do not violate the Fourth Amendment. *Id.* at 731–32 (Scalia, J., concurring). The Supreme Court has not yet resolved which premise governs. *See City of Ontario v. Quon*, 560 U.S. 746, 757 (2010). However, under either approach James can establish a reasonable expectation of privacy in her office and safe.

The *O'Connor* plurality recognized that government employees' expectations of privacy in their offices can be diminished by virtue of office practices and procedures or by legitimate regulation. *O'Connor*, 480 U.S. at 717. The *O'Connor* plurality reasoned that the plaintiff in that case had an expectation of privacy, at the very least, in his desk and file cabinets because he did not share them with other employees and the employer had no policy against storing personal items in them. *Id.* at 718–19. Our court has relied on *O'Connor* for the proposition that government employees' expectation of privacy in the workplace can be reduced through regulations or prior notice to employees that their workspaces were subject to search. *Am. Postal*

*Workers Union v. United States Postal Serv.*, 871 F.2d 556, 560 (6th Cir. 1989) (holding that there is no reasonable expectation of privacy in an employee's locker because employees had signed a waiver indicating they were subject to search); *see also United States v. Broadus*, 7 F.3d 460, 464 (6th Cir. 1993) (finding no reasonable expectation of privacy in the contents of a jacket hanging inside a locker where the defendant shared the locker with a coworker and had signed a form acknowledging the authority of postal inspectors to search the locker at any time). When confronted with circumstances in which such regulations or prior notice to employees were not in place, other circuits have concluded that public employees do have a reasonable expectation of privacy. *See, e.g., United States v. Taketa*, 923 F.2d 665, 673 (9th Cir. 1991) (a private government office that was not open to the public or subject to regular inspection by agency officials, even though some other employees did have access to it); *United States v. Slanina*, 283 F.3d 670, 677 (5th Cir. 2002) (a government-issued computer when there was no policy that computer usage would be monitored and no routine access of other employees to the computer), *vacated on other grounds*, 537 U.S. 802 (2002); *Leventhal v. Knapek*, 266 F.3d 64, 73–74 (2d Cir. 2001) (a desk, filing cabinet, and computer when the employee had exclusive use of the items and there was no policy of routine searches by the employer).

Here, there is no indication of any policies or practices at the 22nd District Court that would have diminished James's expectation of privacy in her office and safe. Nor is there evidence that her office or safe were subject to routine searches by the City of Inkster, other court officials, or the JTC, or that the office was not for her exclusive use. James kept personal belongings in the office. She states that the safe was secured with two locks, and there is no indication that anyone else had access to the safe. She also claims that she purchased the safe

with her personal funds and used it exclusively. Therefore, she can establish a reasonable expectation of privacy in both the office and safe.

### 2. Reasonableness of the Search

Since James has established a reasonable expectation of privacy, we next turn to the question of whether the office and safe were part of the "workplace context" and thus should be analyzed under the reasonableness rubric of *O'Connor*, and if so, whether the search must be upheld as reasonable under the circumstances.

In defining the boundaries of the workplace context, the *O'Connor* plurality explicitly carved out an exception to the reasonableness standard that it set forth for a workplace search:

> Not everything that passes through the confines of the business address can be considered part of the workplace context, however. An employee may bring closed luggage to the office prior to leaving on a trip, or a handbag or briefcase each workday. While whatever expectation of privacy the employee has in the existence and the outward appearance of the luggage is affected by its presence in the workplace, the employee's expectation of privacy in the *contents* of the luggage is not affected in the same way. The appropriate standard for a workplace search does not necessarily apply to a piece of closed personal luggage, a handbag or a briefcase that happens to be within the employer's business address.

*Id.* at 716 (emphasis in original). Although an office is clearly within the bounds of the workplace context delineated in *O'Connor*, no case in our circuit has presented the issue of a warrantless search of a locked personal item that a public employee had not been previously notified would be subject to search. Indeed, the few courts that have analyzed this language from *O'Connor* have distinguished the items that were searched either because they were used primarily for purposes related to their employment or because the employees were on notice that their personal items were subject to search. *See, e.g., United States v. Gonzalez*, 300 F.3d 1048, 1054–55 (9th Cir. 2002) (upholding the search of a public employee's personal backpack as he was leaving work because he had been notified that his personal belongings were subject to

search at any time in order to discourage employee theft and the search did not go beyond the scope appropriate to search for stolen merchandise); *Gossmeyer v. McDonald*, 128 F.3d 481, 490 (7th Cir. 1997) (upholding the search of a filing cabinet and storage unit located in her office, but purchased by the employee, because they were purchased "primarily for the storage of work-related materials," the plaintiff had purchased the items due to a lack of storage space in her office, and the supervisor had a key at least to the storage unit).

The search of James's safe presents very different circumstances than these cases because she claims to have used the safe primarily for personal use. James purchased the safe herself, kept it locked, and used it to store personal items. James alleges that she did not authorize employer use or access; she used it exclusively. Specifically, James alleges that she and her attorney met with Defendant Green and informed her that the safe contained personal documents. In response, James was advised that no one would violate her privacy rights. Importantly, because she was not on notice that her safe could be subject to search and there is no evidence that others had access to her safe or that it was "generally within the employer's control," James's safe is further distinguished from the confines of the workplace delineated in *O'Connor*, 480 U.S. at 715 ("The workplace includes those areas and items that are related to work and are generally within the employer's control."). Thus, although the safe was "within the employer's business address," it is analogous to a piece of closed personal luggage or a briefcase because it was not within the employer's control, and thus is not part of the "workplace context." *Id.* at 716. *O'Connor* counsels that the warrantless search of the safe falls outside the bounds of the special needs exception to the warrant requirement altogether.

Because the safe is not a workplace item, it is subject to the general rule under the Fourth Amendment. The complaint states that the safe was searched absent a warrant, probable cause,

or exception. These allegations sufficiently state an illegal search claim under the Fourth Amendment.

Moreover, even if we consider James's safe to be within the workplace context, thus triggering the special needs exception, James has still stated a plausible claim that the search was unreasonable in its scope because it was "excessively intrusive in light of . . . the nature of the [misconduct]." *Id.* at 726.

In order to state a Fourth Amendment claim against a warrantless search in a workplace context, James must plead facts that could show that the search was unreasonable either at its inception or in its scope. *Id.* James argues that the search of her office and locked safe was unreasonable at its inception because no formal charges had been lodged against her at the time of the search. But there is no support for the proposition that a formal charge is a prerequisite to the search of a government employee's workplace. Indeed, in *O'Connor*, the plaintiff's office was searched after he, like James, had been placed on administrative leave pending an investigation into work-related misconduct. *O'Connor*, 480 U.S. at 712–13. In *Jackson v. City of Columbus*, our court upheld the dismissal of a police chief's claim that his office was unreasonably searched after he was reassigned from his duties upon the city's initiation of an investigation against him for improper conduct. 194 F.3d 737, 744 (6th Cir. 1999), *overruled on other grounds by Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002). At the point of the search, no formal charges had been lodged or disciplinary proceedings commenced against the chief. *Id.* We cannot conclude that the search of James's office was unreasonable simply because it was initiated before formal charges were filed.

James further argues that the search was unreasonable in its inception because it lacked any "safeguards" to ensure that the documents were not destroyed or otherwise made unavailable

to her. But this contention is irrelevant to an analysis of the reasonableness of the search at its inception. Other circuits have focused not on how evidence found in a public employee's office was safeguarded but on whether the evidence seized was work-related or whether there were sufficient grounds to suspect the employee of work-related misconduct. In one case, the Seventh Circuit held that a search of a child protective investigator's office was reasonable at its inception due to an anonymous tip that the investigator possessed child pornography. *Gossmeyer*, 128 F.3d at 491. The court distinguished the facts before it from an earlier Seventh Circuit case disposed of on other grounds in which the court expressed doubt that the search was reasonable at its inception because it was initiated months after an anonymous tip that did not indicate the informant's first-hand knowledge. *Id.* at 491 (citing *Shields v. Burge*, 874 F.2d. 1201, 1204–05 (7th Cir. 1989)). In *Gossmeyer*, by contrast, the court found the anonymous tip to be sufficient grounds to suspect the employee of work-related misconduct because: the tipper identified herself as a coworker and alleged specifically where the pictures could be found; the search was conducted immediately after the tip was received; and the child protective investigator had unusual access to children. *Id.* In another case, the Fourth Circuit found that entry into an employee's office to seize his hard drive was reasonable at the inception of the search because the employer was aware that the employee had misused his Internet privileges to download child pornography. *United States v. Simons*, 206 F.3d 392, 401 (4th Cir. 2000).

Here, there were "reasonable grounds" for suspecting that a search of James's office would yield evidence that James was "guilty of work-related misconduct." *O'Connor*, 480 U.S. at 726. It was reasonable to suspect that the judge's office might contain financial documents and other evidence useful in an investigation. An investigation by Attorney Jones had uncovered possible financial improprieties in the court's management, which led him to file a grievance

with the JTC. By the time the search was conducted, the JTC had begun an investigation against James and the Michigan Supreme Court had voted to place her on administrative leave. The facts here are similar to *Jackson*, where shortly after the city began an investigation against the police chief for improper conduct in office, he was placed on administrative leave, his office was searched, and the matter was later referred to the Columbus Municipal Service Commission. 194 F.3d at 744. The Commission ultimately found that the chief had failed to properly discipline a commander and had destroyed police records in a homicide investigation. *Id.* We found that search to be reasonable in its inception. *Id.* at 755. Like the plaintiff in *Jackson*, James has not alleged facts that suggest it would be unreasonable, given the context of the JTC investigation against her, to suspect her office to contain evidence of her work-related misconduct. Therefore, we conclude that the search of James's office was reasonable at its inception.

James next contends that the search was unreasonable in scope because it "went well beyond a search of records of the 22nd District Court, and involved intrusions" into her locked safe, which was not the property of the court. To be reasonable in scope, a search must be reasonably related to the objectives of the search and not excessively intrusive in light of the nature of the misconduct. *O'Connor*, 480 U.S. at 726. Our court has confronted the issue of a search of a government office most squarely in *Jackson*. There, we upheld a warrantless search of a police chief's office conducted after he was placed on administrative leave. *Jackson*, 194 F.3d at 754–55 ("Jackson alleged that his office was sealed off, his professional and personal belongings were searched, and the locks on his office were changed."). We found that these allegations alone were insufficient to state a claim that the search was unreasonable. *Id.* at 755. And given the subject matter of the misconduct allegations against James—including

- 15 -

employment irregularities and misappropriation of public funds—a thorough search of areas that might contain financial and employment records is "reasonably related to the objectives of the search." *O'Connor*, 480 U.S. at 726. James acknowledged in her complaint that she had "taken control" of the court's finances in 2010—all the more reason to suspect that financial documents pertinent to the investigation would be located in her office. However, unlike in *Jackson*, James alleges that a locked personal item—her safe—was also searched, and thus *Jackson* does not settle the question of whether the search was unreasonable in scope. As discussed above, James has alleged that she purchased the safe, maintained it for her personal use, and kept it under lock and key. These facts are sufficient to establish a plausible claim that it was excessively intrusive to search her personal safe, because evidence of work-related misconduct was unlikely to be found there. *See O'Connor*, 480 U.S. at 726.

The defendants argue that due to an audit that indicated irregularities in the finances of the 22nd District Court, it was reasonable to search James's safe for documents that might uncover evidence of her misconduct, and that since James alleges that some of the documents in the safe were exculpatory, they must necessarily be work-related. We are unconvinced by this contention. As James has pointed out, personal financial documents could be considered exculpatory to charges of improper expenditures of court funds if the documents showed that she had used personal funds for certain purchases. Further, we note that the defendants' argument that there were grounds for the search also demonstrates that there were likely grounds for the JTC to secure a warrant. James had already been placed on administrative leave and did not have access to her office or safe at the time of the search, and there is no indication of any exigent circumstances that would have made it impracticable for the JTC to obtain a search warrant. Moreover, while many workplace searches under the *O'Connor* exception involve

employers like public hospitals where a warrant requirement may impose unreasonable demands on supervisors who are unfamiliar with such procedures, we do not believe that a warrant requirement for a search of James's personal safe would "seriously disrupt the routine conduct of business and be unduly burdensome" for an investigative body like the JTC. *O'Connor*, 480 U.S. at 722.

Therefore, we find that James has stated a claim that the search of her locked personal safe was unreasonable. Accordingly, we reverse the district court's dismissal of James's Fourth Amendment claim.

### C. Equal Protection Claim

In order to prevail on a Fourteenth Amendment equal protection claim under 42 U.S.C. § 1983, a plaintiff must prove the same elements required to establish a disparate treatment claim under Title VII of the Civil Rights Act of 1964. *Perry v. McGinnis*, 209 F.3d 597, 601 (6th Cir. 2000). A plaintiff may prove disparate treatment either by direct evidence of discriminatory motive or through circumstantial evidence based on a prima facie showing of discrimination. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). In order to establish a *prima facie* case of racial discrimination under the burden-shifting framework laid out in *McDonnell Douglas*, the plaintiff must show that 1) she was a member of a protected class; 2) she suffered an adverse employment action; 3) she was qualified for the job; and 4) she was treated differently from similarly situated employees who were not members of the protected class. *Perry*, 209 F.3d at 601. Upon establishing the *prima facie* case, the burden shifts to the defendant to show evidence of a legitimate nondiscriminatory reason for the adverse employment action. *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 391 (6th Cir. 2008). Here, the district court found that James did not state a plausible claim because she did not demonstrate

that she and the other judges engaged in relevantly similar conduct. *See Wright v. Murray Guard, Inc.*, 455 F.3d 702, 710 (6th Cir. 2006). Accordingly, the district court held that James had not established the fourth prong of the *prima facie* case and thus dismissed her complaint.

Although it is ultimately James's burden either to establish the elements of the *prima facie* case under *McDonnell Douglas* or to offer direct evidence of discrimination, the Supreme Court has held that *McDonnell Douglas* sets an evidentiary standard, not a pleading requirement. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 510 (2002). In *Swierkiewicz*, a unanimous Court reasoned that because a plaintiff may ultimately rely on either direct or circumstantial evidence to make out a case of discrimination, it would be inappropriate to require "a plaintiff without direct evidence of discrimination at the time of his complaint" to "plead a prima facie case of discrimination, even though discovery might uncover such direct evidence." *Id.* at 511. Because "the precise requirements of a prima facie case can vary depending on the context," it is inappropriate to require the plaintiff to plead certain facts she may ultimately not need to prove. *Id.* at 512.

Our court has held that *Swierkiewicz* remains good law after the Supreme Court's decisions in *Iqbal* and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007). *See Keys v. Humana, Inc.*, 684 F.3d 605, 609 (6th Cir. 2012). We have consistently held that *McDonnell Douglas* "does not set the standard for pleading any complaint." *Lindsay v. Yates*, 498 F.3d 434, 439–40 (6th Cir. 2007); *see also Pedreira*, 579 F.3d at 728 (explaining that an analysis of the prima facie case under the *McDonnell Douglas* framework is "premature" at the motion to dismiss stage). Therefore, it was improper for the district court to dismiss James's claim on the ground that she had failed to plead a *prima facie* case under *McDonnell Douglas*. The district court erroneously relied on our decision in *Perry*, which applied the *McDonnell Douglas*

framework to a review of a district court's grant of *summary judgment* to an employer on a racial discrimination claim. 209 F.3d at 600. To withstand a motion to dismiss, James's complaint need only provide "an adequate factual basis" for a discrimination claim in order to satisfy the pleading requirements of Federal Rule of Civil Procedure 8(a)(2). *Serrano v. Cintas Corp.*, 699 F.3d 884, 897 (6th Cir. 2012).

Although the plaintiff may survive a motion to dismiss without pleading a *prima facie* case of discrimination, the complaint must nevertheless allege sufficient "factual content" from which a court could "draw the reasonable inference" of racial discrimination. *Iqbal*, 556 U.S. at 678. In *Swierkiewicz*, in which both national origin and age discrimination were at issue, the Supreme Court held that the plaintiff "easily satisfie[d]" the pleading requirements with a complaint that "detailed the events leading to his termination, provided relevant dates, and included the ages and nationalities of at least some of the relevant persons involved with his termination." 534 U.S. at 514. Recently, in *Keys*, we reversed a district court's dismissal of a Title VII race discrimination claim because the African-American plaintiff's complaint detailed several specific adverse employment actions in which she alleged she was treated differently than her white counterparts and identified key supervisors and other relevant persons by race and either name or company title. 684 F.3d at 610.

James alleges facts that are sufficient "to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. She identifies herself as a member of a protected class, details the JTC's investigation against her both prior and subsequent to her suspension from her judgeship, and identifies and describes the misconduct of five white state court judges who were not investigated or disciplined by the JTC. Although the district court correctly noted that James's complaint lacks significant detail of the alleged misconduct of the other judges, on its

face the complaint provides enough facts to "raise a right to relief above the speculative level." *Id.* at 555. Her factual allegations are analogous to those in *Swierkiewicz* and *Keys*, in which the plaintiffs pleaded membership in the protected class, specific adverse employment actions taken against them, and instances in which they were treated less favorably than identified non-class members. She does not merely make "conclusory allegations" that the JTC treated white judges differently, but identifies specific individuals and summarizes instances of their misconduct. *Cf. 16630 Southfield Ltd. P'ship v. Flagstar Bank, F.S.B.*, 727 F.3d 502, 506 (6th Cir. 2013) (upholding the dismissal of a race discrimination claim in which the plaintiffs alleged their belief that a bank had refinanced the loans of delinquent white borrowers but failed to identify these borrowers). The "factual content" she alleges, in the form of the misconduct of the other judges, is sufficient to draw a reasonable inference of discrimination because she points to specific instances of abuse of judicial power by white judges. For instance, she alleges that one judge had improperly used court funds to pay off a court employee who reported inappropriate personal contact between the judge and a litigant, and that other judges had engaged in various other employment improprieties. James's complaint is thus sufficient to "giv[e] rise to 'reasonably founded hope that the discovery process will reveal relevant evidence' to support" her claims. *Lindsay*, 498 F.3d at 440 n.6 (quoting *Twombly*, 550 U.S. at 559–60).

Accordingly, we reverse the dismissal of James's equal protection claim as to the State Defendants and remand for further proceedings. Because James has not alleged an equal protection claim against the Inkster Defendants, on remand the district court need only consider this claim against the State Defendants.

### D. Supplemental Jurisdiction

"The law-of-the-case doctrine bars challenges to a decision made at a previous stage of the litigation which could have been challenged in a prior appeal, but were not." *United States v. Adesida*, 129 F.3d 846, 850 (6th Cir. 1997). In its January 2012 order denying James's motion for a TRO, the district court declined to exercise supplemental jurisdiction over her state law claims. When James subsequently appealed both that order and the April 2012 order granting defendants' motion to dismiss under the doctrine of *Younger* abstention, she did not raise the issue of supplemental jurisdiction. Because she could have raised the issue during the first appeal, she may not now challenge the district court's decision not to exercise supplemental jurisdiction over her state law claims.

James argues that she did in fact raise the issue in her first appeal because she appealed the district court's January order and because she argued in her reply brief on the first appeal that the district court abused its discretion in declining to exercise jurisdiction. Both of these arguments lack merit. Federal Rule of Appellate Procedure 28(a)(5) requires that an appellant's brief contain a statement of the issues presented for review and an argument on each issue presented. *Radvansky v. City of Olmsted Falls*, 395 F.3d 291, 318 (6th Cir. 2005). But James did not present the issue of supplemental jurisdiction in her statement of issues, nor did she advance the argument elsewhere in her opening brief in the first appeal.

Although James did subsequently raise the issue of supplemental jurisdiction in her reply brief, an issue raised for the first time on appeal in a reply brief is generally not reviewable. *Osborne v. Hartford Life & Accident Ins. Co.*, 465 F.3d 296, 301 (6th Cir. 2006) ("We ordinarily do not entertain an argument first made in a reply brief."); *Marks v. Newcourt Credit Group, Inc.*, 342 F.3d 444, 462 (6th Cir. 2003) ("An appellant waives an issue when he fails to present it

in his initial briefs before this court."). Therefore, we need not review James's supplemental jurisdiction claim because she had the opportunity to raise the issue in her prior appeal but did not.

Moreover, even if James did not waive the issue, the district court did not abuse its discretion here. Our decisions have consistently affirmed that supplemental jurisdiction is a "doctrine of discretion, not of plaintiff's right." *Habich v. City of Dearborn*, 331 F.3d 524, 535 (6th Cir. 2003) (internal quotation marks omitted). A district court may decline to exercise supplemental jurisdiction, among other reasons, if the claim "raises a novel or complex issue of State law." 28 U.S.C. § 1367(c)(1). Here, the district court found that James's common law right-to-privacy claim presented a novel and complex issue of state law and therefore declined to exercise jurisdiction over that claim as well as her remaining state law claims. The court did not articulate its reasons for declining to exercise jurisdiction over the remaining state law claims, but did cite 28 U.S.C. § 1367(c)(4) in noting its discretion to decline to exercise jurisdiction if there are "compelling reasons" to do so. It was reasonable for the district court to conclude that a novel and complex state law issue made the exercise of its jurisdiction over all of James's state law claims unwise.

Although James argues that the district court abused its discretion because the interest of judicial economy weighs in favor of exercising supplemental jurisdiction, the appropriate inquiry for the trial court is not to consider only judicial economy but to balance the "interests of judicial economy and the avoidance of multiplicity of litigation" against "needlessly deciding state law issues." *Landefeld v. Marion General Hosp., Inc.*, 994 F.2d 1178, 1182 (6th Cir. 1993). In *Landefeld*, we upheld the district court's decision because it found novel state law questions and "no overwhelming issues of judicial economy." *Id.*; *see also Gamel*, 625 F.3d at 953 (affirming

a district court's decision to decline to exercise supplemental jurisdiction when the court found that exercising jurisdiction would not advance judicial economy and would result in an unnecessary resolution of state law). The district court dismissed James's state claims early in the proceedings, which minimized any delay and inconvenience to James. *See Musson Theatrical, Inc. v. Fed. Express Corp.*, 89 F.3d 1244, 1255 (6th Cir. 1996) (suggesting that dismissal of state claims is more appropriate "when the court has not yet invested a great deal of time" into their resolution). We thus affirm the district court's dismissal of James's supplemental state law claims.

### III. CONCLUSION

For the foregoing reasons, we reverse the district court's dismissal of James's Fourth and Fourteenth Amendment claims and remand for further proceedings consistent with this opinion. We affirm the dismissal of James's supplemental state law claims.

**DAMON J. KEITH, concurring in part and dissenting in part**. I concur in part and dissent in part because the holding that James did not plead facts sufficient to demonstrate that the search of her office was unreasonable is based on a misapplication of the presumption of truth given to pleadings under the Federal Rules of Civil Procedure. Otherwise, I fully concur with Chief Judge Cole and his reasoning. As the majority opinion acknowledges, in reviewing a district court's dismissal of a claim under Rule 12(b)(6), we are required to construe the complaint in the light most favorable to a plaintiff and accept all allegations as true. *Keys*, 684 F.3d at 608. The majority held that James had a legitimate expectation of privacy in her office but that the search of her office was reasonable in its inception because it was reasonable to suspect that her office might contain financial documents and evidence useful in Defendants' investigation. I agree that the conclusion that the search was reasonable in its inception might be accurate but only if James had pleaded that her office was searched to further a legitimate investigation. James did not so aver. James alleged in her complaint that Defendants initiated fraudulent claims against her to intimidate her and ultimately remove her from office. James further alleged that there was no proper purpose to search her office and that the investigation and search were, in fact, initiated for the express purpose of pushing her out of office. For the following reasons, I find that these allegations sufficiently state an illegal search-of-office claim under the Fourth Amendment.

Although the Supreme Court recognized an exception in *O'Connor* to the Fourth Amendment's protection against warrantless and unreasonable searches and seizures, the exception is not without limits, limits that I believe apply to this case. As a starting point, *O'Connor* defined the workplace, stating that "[t]he workplace includes those areas and items that are related to work and are generally within the employer's control . . . [e.g.,] offices, desks

and file cabinets, among other areas . . . ." *O'Connor*, 480 U.S. at 715−16. The court then held that if an employer searches the workplace area to which the employee does not have a legitimate expectation of privacy, there is no constitutional violation. *Id.* If, on the other hand, an employer searches an area to which the employee has a legitimate expectation of privacy, to withstand constitutional rigor, the search must be reasonable in both its inception and scope. *Id.* at 717−18, 726. *O'Connor* held that a search is only reasonable in its inception "when there are reasonable grounds for suspecting that the search will turn up evidence that the employee is guilty of work-related misconduct." *Id.* at 726. To be reasonable in scope, a search must be "reasonably related to the objectives of the search and not excessively intrusive in light of the nature of the misconduct." *Id.* (alterations in original) (citation omitted).

There is little room to dispute that James had a legitimate expectation of privacy in her office. This case turns on whether the alleged search of James's office was reasonable, specifically whether it was reasonable in its inception. The majority concludes that Defendants' proffered reason for searching James's office justifies the search even though it is contrary to James's allegations. The majority states, "It was reasonable to suspect that the judge's office might contain financial documents and other evidence useful in an investigation, and James has not alleged any facts that suggest otherwise." It is this disregard for the facts alleged in the complaint that leads directly to error, because the complaint does suggest otherwise. *See United States v. Hamilton*, 538 F.3d 162, 169 (2d Cir. 2008) (reversible error when a district court fails to credit the facts asserted). James alleged that: (1) the search was conducted to remove exculpatory evidence and "alter[] Court documents to create the appearance of wrongful conduct" in order to create negative publicity that would lead to her removal; and, (2) this scheme was only concocted to remove a black judge from office who spoke against a political

figure. James even asserted the name of a staff member who was allegedly coerced into searching her office and destroying her documents. James further alleged that other staff members were instructed not to assist her with her defense. And, she alleged that white judges who were under review by the JTC were treated less harshly than her because of race. These allegations are sufficient "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. As further proof, James attached an affidavit to the complaint of an attorney who worked for both the JTC and Attorney Grievance Commission of the MSC. The affidavit says, "The treatment James has received by the JTC and MSC is unprecedented."

Notably, the majority reaches all arguments, except the argument that Defendants created a ploy to remove a black judge from office and that searching her office was merely part of the scheme. To that end, the majority cites many cases, but none of these cases is instructive on the pleading standard required to challenge the purpose of a workplace search. *Jackson* is a case where we, interpreting the Ohio Constitution, held that the plaintiff failed to state a claim regarding the search of his office because he only alleged that "his office was sealed off, his professional and personal belongings were searched, and the locks on his office were changed." 194 F.3d at 754-55. We held that "these facts do not establish that the search was unreasonable, unjustified in its inception, or unreasonably related in scope to the circumstances that prompted it." *Id.* at 755. We did not state the extent of specificity that is required to state a claim for an unconstitutional search of an office. *Gossmeyer,* like *Jackson*, does not analyze an instance when the purpose of the search is disputed. In *Gossmeyer*, the Seventh Circuit held that a reliable tip could support a workplace search. 128 F.3d at 491. The Fourth Circuit's holding in *Simons* is also distinguishable because the employer's justification for the search was not

challenged. *Simons* held that the seizure of an employee's hard drive was reasonable in its inception because the employer was already aware that the employee "had misused his Internet access to download over a thousand pornographic images, some of which involved minors." 206 F.3d at 401 (citing *O'Connor*, 480 U.S. at 726). Because the plaintiffs in the above cases did not allege facts challenging the justification of the searches, these cases are less instructive.

*O'Connor*, however, is directly instructive here given that the complaint sets forth a factual reason for challenging the constitutionality of the search of James's office. There, the Supreme Court held that when the parties are "in dispute about the actual justification for the search, and the record [is] . . . inadequate for a determination of [its] reasonableness[,]" summary judgment is inappropriate. *O'Connor*, 480 U.S. 727. If it is improper to grant summary judgment when the justification of the search is disputed, the same certainly holds true on a motion to dismiss standard when the allegations are taken as true and viewed in the light most favorable to a plaintiff.

While no court has specifically set forth the pleading standard required to sufficiently state a claim for an illegal workplace search, or as the majority would require, to challenge an employer's reason for conducting a workplace search, there is case law discussing the unconstitutionality of searches conducted for personal reasons, unrelated to work. *See generally Abbott v. Village of Winthrop Harbor*, 205 F.3d 976, 982–83 (7th Cir. 2002) (recording the personal telephone line of officer for personal reasons, unrelated to police work is unconstitutional). James unequivocally alleged that the search of her office was personal. She asserted that a defendant met with her and told her that the accusations, which Defendants argue warranted the search, were political. Because the complaint, viewed in a light most favorable to

James, compels the inference that there was no proper purpose to search her office, James did sufficiently state an illegal search-of-office claim under the Fourth Amendment.

*Gossmeyer* further emphasizes why James's search-of-office claim is plausible as alleged. *Gossmeyer* held that a tip is reliable, even if anonymous, when the tip: (1) comes from a source who would have knowledge of the misconduct, (2) is serious and specific, and (3) specifically identifies where evidence of the misconduct can be found. *See Gossmeyer*, 128 F.3d at 491. Here, the information that Defendants argue prompted the search did not come from a reliable source, it came from Jones. The majority states that Jones's grievance, which alleged abuse of office, justified the search. James alleged, however, that Jones was hired to disparage her in an effort to remove her from office and that filing a false charge was allegedly part of the scheme. James also alleged that Defendants worked collectively to achieve that common goal. The information Jones provided could not reasonably support a legitimate search because of his purported bias and alleged conspiracy to remove James from office. Secondly, the record is devoid of the details contained in Jones's grievance. We only know that the grievance was based on abuse of office. We do not know what the grievance detailed. We do not even know if the grievance stated where evidence of misconduct could be found. The record does not support that Jones's grievance contained enough specificity to reasonably support a search. Thus, the majority errs in concluding that the search was reasonable based on Jones's grievance because such a conclusion ignores that James alleged that Jones was part of the scheme and the record is lacking in detail.

Even if Jones's grievance would have been a reliable basis to search James's office, it could not support the search because it had gone stale. The majority reasons that the timeline of the investigation and search of James's office is analogous to the investigation and search of the

police chief's office in *Jackson*. But, it is not. In *Jackson*, the chief's office was searched no more than a month after an investigation began and days after he was reassigned pending further investigation. 194 F.3d at 744. The search of James's office occurred several months after Defendants' investigation began and Jones's grievance was filed. Jones was hired and began to investigate James in 2010. Jones's investigation lasted months. Jones filed his grievance with the JTC in February 2011. While on leave and sometime after May 2011, James's office and safe were searched. James alleged that on June 14, 2011, documents seized during the search were provided to the JTC, but she did not learn of the search until after it was completed. James alleged that, sometime before the JTC filed its complaint, she was allowed one hour to enter her office and retrieve items. When she entered her office, she found that "locks to her personal safe had been dismantled and that many of the documents that would be exculpatory were missing from her office and safe." According to this timeline, the search was conducted roughly six months after the investigation began and at least three months after the grievance was filed. Therefore, it is not plausible to think that Jones's grievance supported the ground for the search.

The majority, however, argues that the grievance was sufficient to justify the search of James's office because "Attorney Jones had uncovered *possible* financial improprieties in the court's management, which led him to file a grievance with the JTC." Defendants hired an attorney to investigate James who, as the majority holds, discovered only the *possibility* of financial impropriety after a several-month long investigation. But, the *possibility* of misconduct is not the standard; there must be sufficient grounds to suspect the employee of work-related misconduct. Even considering that it were the standard, Jones's uncovered possibility would not suffice because information about the grievance is lacking in detail. And, information about what possible financial improprieties Jones discovered is also lacking in detail. It is error to hold

that a grievance, which we only know was based on abuse of office, is sufficient to suspect James of work-related misconduct.

The search of James's office was, at best, a mere unauthorized fishing expedition. *Shields*, a case to which *Gossmeyer* distinguished its ruling, expressed more than doubt that "the sparse record did not establish the nature of the tip, the reliability of the informant, the extent to which the tip was corroborated, or any other facts which might have led investigators to suspect that Shields was involved in any misconduct[,]" *Gossmeyer*, 128 F.3d at 491 (citing *Shields*, 874 F.2d at 1204), as the majority's main focus. The court was equally concerned that the search took place several months after the tip had been received. *Id.* Specifically, *Shields* cautioned that the delay between a tip and a search would create "an inference . . . that instead of being based on reasonable grounds that the search would discover relevant evidence, the search was merely a fishing expedition conducted with the *hope* that something would turn up." 874 F.2d at 1204 (emphasis added); *see also Shamaeizadeh v. Cunigan,* 338 F.3d 535, 549 (6th Cir. 2003).

According to James, the search was conducted with the *hope* to find her personal, exculpatory documents and destroy them. James alleged that the search was conducted no longer than one month after she and her attorney informed Defendants that there were personal documents in her office and safe. James alleged that during that meeting, she questioned, but was assured of, the safe keeping of her personal documents and privacy. She alleged that after that meeting, Defendants searched her office without her knowledge or consent, seizing exculpatory documents to thwart her defense. The above meeting took place in May 2011. Although the exact date of the search is not alleged, the James did allege that it occurred prior to June 14, 2011. Because the date of the meeting is in closer proximity to the search, it is plausible to believe that James's alleged conversation with Defendants prompted the search of her office,

not Jones's grievance. If this is true, not only have Defendants been disingenuous about what prompted their search, the search was undoubtedly unjustified. For the above reasons and taking all of the allegations in the complaint as true, there are sufficient allegations which establish that the search was unreasonable at its inception. Accordingly, James sufficiently pleaded an illegal search-of-office claim under the Fourth Amendment.

Because James pleaded an illegal search-of-office claim, the search of her safe was also illegal for these reasons stated above as well as for those reason stated in the majority opinion. And, because the alleged search of office and safe were illegal, so was the seizure of documents within the office and safe. Although fourth-amendment cases sometimes refer synonymously to searches and seizures, "there are important differences between the two." *United States v. Giannetta*, 909 F.2d 571, 578 (1st Cir. 1990). Seizures refer to a retained interest in the possession of property, searches to personal privacy. *Texas v. Brown*, 460 U.S. 730, 747 (1983); *see also Arizona v. Hicks*, 480 U.S. 321, 328 (1987). *O'Connor* declined to decide the appropriate Fourth Amendment standard for seizures made pursuant to a warrantless workspace search, *O'Connor*, 480 U.S. at 729 n.* ("We have no occasion in this case to reach the issue of the Fourth Amendment reasonableness of seizures . . . [n]either the District Court nor the Court of Appeals addressed the issue . . . ."), and neither need we. Because the alleged search of the office and safe were unconstitutional, so was the seizure of documents derived from the search. I respectfully concur in part and dissent in part.

**ALICE M. BATCHELDER, Circuit Judge, dissenting.** Given the amount of ink that has been spilled in this case, it is difficult to determine which opinion controls on which point. For the sake of ease, I will refer to Chief Judge Cole's opinion as the majority opinion. Although I agree with the majority that there was no Fourth Amendment violation in the search of James's office and that James has waived her supplemental jurisdiction argument, I respectfully dissent from the remainder of the opinion. The majority opinion's Fourth Amendment analysis regarding the safe rests on the dubious assumption that a safe is more analogous to a portable, lightweight briefcase or piece of luggage than the more permanent office fixtures of a desk or filing cabinet. Because a safe should be analyzed as part of the "workplace context," and because the search here was both justified at its inception and reasonable in its scope, the district court properly dismissed James's Fourth Amendment claim. Further, although the majority is correct to point out that James need not plead a prima facie case of discrimination, she still must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). She has not met even this liberal pleading standard and thus the district court did not err in dismissing her Fourteenth Amendment claim either. I would affirm the district court's opinion in its entirety.

## I.

The majority's Fourth Amendment analysis rests on two separate misapprehensions of *O'Connor v. Ortega*, 480 U.S. 709 (1987). First, the majority incorrectly places the safe outside of both the workplace context and, by extrapolation, *O'Connor*'s reasonableness inquiry for workplace searches. Second, assuming arguendo that the safe is part of the workplace context, the majority analyzes the search under the *O'Connor* framework but incorrectly characterizes it as unreasonable in its scope.

## A.

Whether or not an item is part of the "workplace context" is a threshold inquiry that determines whether an individual has a reasonable expectation of privacy in that item. *See O'Connor*, 480 U.S. at 715 ("Because the reasonableness of an expectation of privacy, as well as the appropriate standard for a search, is understood to differ according to context, it is essential first to delineate the boundaries of the workplace context.").[1] The *O'Connor* Court contrasted the workplace context, which includes hallways, cafeterias, offices, desks, and filing cabinets with things that merely "pass[] through the confines of the business address" such as closed luggage, handbags, or briefcases. *Id.* at 716. Purely as an intuitive matter, the most relevant factor for distinguishing between the two groups is the portable nature of the item. Desks and filing cabinets are fixtures of an office whereas handbags and briefcases can rightly be said to "pass[] through the confines of the business address," usually on a daily basis. Indeed, the items the Court placed outside the workplace context are inherently transient. *See id.* ("An employee may bring closed luggage to the office *prior to leaving on a trip*, or a handbag or briefcase *each workday*." (emphasis added)). By contrast, few employees, if any, lug a safe to and from work each day.

In the majority's opinion, however, a safe is analogous to a piece of closed personal luggage or a briefcase. This defies reason. The majority emphasizes that James purchased the safe herself and kept it locked. But in *Gossmeyer v. McDonald*, 128 F.3d 481 (7th Cir. 1997), a case on which the majority relies, the plaintiff similarly contended that she had an expectation of privacy in a filing cabinet and a storage unit because she had bought them herself and kept them locked. *Id.* at 490. The court rejected this argument, declining "to find an expectation of privacy

---

[1] Curiously, the majority analyzes whether or not the safe is part of the workplace context in its analysis of the reasonableness of the search, after already having determined that James had a reasonable expectation of privacy in her office and her desk.

in the cabinets simply because [plaintiff] bought them herself." *Id.* Next, the majority emphasizes that James was not on notice that her safe could be searched. Neither was the plaintiff in *Gossmeyer*, and nowhere in *O'Connor* is such a notification required to keep a stationary item in the workplace context. The majority has invented this requirement out of whole cloth. Finally, the majority points out that James used the safe to store personal items. The Court in *O'Connor*, however, noted that desks and filing cabinets "remain part of the workplace context even if the employee has placed personal items in them." 480 U.S. at 716. Thus, the contents of an item in question are wholly irrelevant; the reasonable-expectation-of-privacy determination rests on the nature of the container.

"The workplace includes those areas and items that are related to work and are generally within the employer's control." *Id.* at 715. A piece of luggage, a handbag, or a briefcase remains outside the employer's control for purposes of the Fourth Amendment because it accompanies an employee to and from work. The safe, like a desk or a filing cabinet, is immobile and thus becomes part of the workplace. If James had wanted to shield any personal belongings in her government-provided office, she could have heeded the Court's advice: "The employee may avoid exposing personal belongings at work by simply leaving them at home." *Id.* at 725. Instead, she brought the safe into her office and used it to hold documents. It thus is part of the workplace context, and properly falls within *O'Connor*'s reasonableness analysis. The majority incorrectly places the safe outside of this framework.

**B.**

Having determined that the safe falls outside the workplace context, the majority then assumes arguendo that the reasonableness inquiry applies and analyzes the search under that rubric. The majority again comes to the wrong result. While I agree with the majority that the

search was clearly justified at its inception, I believe it erred by holding that the search was unreasonable in its scope.

"Under this reasonableness standard, both the inception and scope of the intrusion must be reasonable. . . ." *O'Connor*, 480 U.S. at 726. The majority believes the search of James's office was reasonable in its scope because "given the subject matter of the allegations against James—including employment irregularities and misappropriation of funds—a thorough search of areas that might contain financial and employment records" was reasonable. Maj. Op. 14. It is difficult to see why this same reasoning would not also apply to James's safe. It is not unreasonable for the defendants to have believed that the safe would also hold financial and employment records, exactly the type of documents kept in safes.

The majority argues that the defendants were unlikely to find evidence of work-related misconduct in the safe because James had purchased the safe, maintained it for her personal use, and kept it secured. None of these factors are legally relevant as to whether the scope of the search was unreasonable. In *Gossmeyer*, the court found the search of the plaintiff's desk and filing cabinet reasonable in scope because "[t]he targets of the search were those places where [plaintiff] would likely store the alleged pornographic pictures." 128 F.3d at 491. Similarly, the defendants here reasonably believed the safe could contain financial or employment records. That James told the defendants the safe held only personal documents is irrelevant, because, despite her claim, a safe would be a logical place for someone to keep such records. *See Demaine v. Samuels*, 29 F. App'x 671, 675 (2d Cir. 2002) (holding that a search of plaintiff's day planner for notes was reasonable because, despite plaintiff's protest that its use was personal, a day planner is "a logical place for someone to record such information").

The defendants were looking for evidence of financial and employment improprieties. The majority concedes that James's office would be a natural place to look. Maj. Op. 14. What the majority ignores, however, is that a safe in the office would be just as natural, despite its ownership status or alleged contents. It was reasonable for the defendants to search the safe for financial and employment records. For that reason, I must dissent from the majority's Fourth Amendment holding as it pertains to the safe.

**II.**

As for the Fourteenth Amendment claim, even though the Supreme Court held in *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 510 (2002), that *McDonnell Douglas* sets an evidentiary standard, not a pleading requirement, it made clear in *Twombly* that a discrimination plaintiff must still plead "enough facts to state a claim to relief that is plausible on its face." 550 U.S. at 569–70. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

The majority relies on two cases to prove that James pleaded sufficient factual content for the court to draw a reasonable inference of racial discrimination: *Swierkiewicz* itself and *Keys v. Humana, Inc.*, 684 F.3d 605, 609 (6th Cir. 2012). The plaintiffs in both of those cases, however, pleaded significantly more factual detail than James did here. In *Swierkiewicz*, the plaintiff alleged that he was demoted and replaced by a younger employee of the employer's nationality; that that employee was inexperienced; that the purpose of promoting the younger employee was to "energize" the department; that the employer excluded plaintiff from business decisions and meetings; that plaintiff sent a memo to the employer outlining his grievances and tried to meet with the employer to discuss his discontent; and that plaintiff was fired. 534 U.S. at 508–09.

Similarly, in *Keys*, the plaintiff alleged that she was hired as a Director but was given the title of Consultant Leader instead of Director; that Caucasian candidates who accepted Director positions were given the correct title; that Caucasian Directors were given an incentive plan of twenty-five percent while plaintiff was only given fifteen percent; that plaintiff was excluded from weekly sales meetings when all Caucasian Directors were invited; that her employer reorganized its management staff and removed only plaintiff from her role; that plaintiff was placed on a performance improvement plan despite the fact that she met her performance expectations while "[s]imilarly situated Caucasian employees" were not placed on such plans; and that she was eventually terminated. 684 F.3d at 607 (internal quotation marks omitted). Both the Supreme Court and this court found that these allegations easily satisfied the pleading requirements. *See Swierkiewicz*, 534 U.S. at 507; *Keys*, 684 F.3d at 610.

James has not pleaded enough factual detail to satisfy even liberal pleading requirements. James made a broad and conclusory allegation that the defendants violated her right to equal protection "by prosecuting a complaint to remove her from the bench under circumstances that they routinely decline to pursue with matters involving respondents who are not African-American." She then described five Caucasian judges who abused their power, including such improprieties as using court funds to pay off a court employee. Despite the majority's contention that this level of detail is enough because a court could draw "a reasonable inference of discrimination because she points to specific instances of abuse of judicial power by white judges," Maj. Op. 20, these facts do not make her claim plausible.[2]

---

[2]In an attempt to analogize to *Swierkiewicz* and *Keys*, the majority notes that James, along with discussing the judges who abused their power, also details "specific adverse employment actions" taken against her by the JTC. Maj. Op. 20. The only "specific adverse employment action" the majority highlights, however, is the JTC's investigation. This court has held that an internal investigation of an employee is not an adverse employment action. *See Kuhn v. Washtenaw Cnty.*, 709 F.3d 612, 625 (6th Cir. 2013). The majority's, and James's, focus is misplaced.

A case from our sister circuit, *Coleman v. Maryland Court of Appeals*, 626 F.3d 187 (4th Cir. 2010), is instructive. In *Coleman*, a plaintiff's conclusory allegation that he was treated differently as a result of his race was insufficient—even where he had identified an alleged comparator—because no factual allegations plausibly suggested the comparator was similarly situated. The complaint in that case alleged that the plaintiff, who was terminated for allegations of steering contracts to vendors in which he had an interest, "was treated differently as a result of his race than whites" and specifically identified another employee as a white person who was not disciplined despite also having "outside business involvements." *Id.* at 191 (internal quotation marks omitted). The court held, however, that the complaint "fails to establish a plausible basis for believing [comparators] were actually similarly situated or that race was the true basis for [plaintiff's] termination." *Id.* (footnote omitted). Further, the court criticized the complaint for failing to allege "that any impropriety was comparable to the acts [plaintiff] was alleged to have committed." *Id.* Absent such support, the court concluded that the allegations of race discrimination were speculative. *Id.*

James is not required to plead the four elements of *McDonnell Douglas*. That much is clear. However, "broad and conclusory allegations of discrimination cannot be the basis of a complaint and a plaintiff must state allegations that plausibly give rise to the inference that a defendant acted as the plaintiff claims." *HDC, LLC v. City of Ann Arbor*, 675 F.3d 608, 613 (6th Cir. 2012). Unlike the plaintiffs in *Swierkiewicz* and *Keys*, who pleaded multiple facts that could form the basis for a plausible allegation of discrimination, James simply pointed to five Caucasian judges who were not investigated despite their improprieties. Although the majority accepts James's invitation to raise the level of generality needed for a valid discrimination claim, even a cursory look at her complaint shows that her conduct does not compare to that of these

other judges. Other than the fact that James is African-American and the five judges are Caucasian, her pleaded facts show no plausible basis for believing that race was the true basis for the JTC's investigation of her. And while the majority is correct to note that James is not required to *demonstrate* that she and other judges engaged in relevantly similar conduct at this stage in the litigation, she must plead enough facts to "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

I respectfully dissent.